

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00499-CR

JERRY LEE PITMAN                                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

## FROM THE 30TH DISTRICT COURT OF WICHITA COUNTY

----------

## OPINION

----------

## INTRODUCTION

Appellant Jerry Lee Pitman pleaded guilty to two counts of aggravated sexual assault without an agreed punishment recommendation. The trial court sentenced Appellant to two consecutive life sentences. In three related issues, Appellant asserts that the trial court abused its discretion by denying his motion for new trial, in which he alleged that the State's failure to disclose documents prior to his guilty plea and punishment hearing violated his due process and due

course of law rights.[1]  Appellant specifically argues that the State violated the dictates of *Brady v. Maryland* by failing to disclose 3,000 pages of Child Protective Services (CPS) records containing among other documents notes from the complainant's therapy sessions that were inconsistent with the complainant's and the therapist's trial testimony.[2]  *See* 373 U.S. 83, 83 S. Ct. 1194 (1963).  We affirm.

## APPLICABLE LAW

In *Brady v. Maryland*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87, 83 S. Ct. at 1196–97; *see Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011).  The court of criminal appeals has held that to find reversible error under *Brady*, an appellant must show that (1) the State failed to disclose

---

[1]Appellant asserts that "Texas provides constitutional protection consistent with *Brady et. al.*," therefore we do not separately address his rights under the state constitution.

[2]Appellant also briefly refers to article 40.001 of the code of criminal procedure and the corresponding four-part newly-discovered evidence test for obtaining a new trial.  Appellant did not raise this issue in his new-trial motion or at the new-trial hearing, however.  Because Appellant complains on appeal that the trial court erred by denying his motion for new trial, he must have raised his newly-discovered evidence claim during the new-trial hearing to preserve the complaint for appellate review.  Because he did not, he has forfeited this complaint on appeal.  *See* Tex. R. App. P. 33.1; *Keeter v. State*, 175 S.W.3d 756, 759–61 (Tex. Crim. App.), cert. denied, 546 U.S. 852 (2005).

2

evidence, regardless of the prosecution's good or bad faith; (2) the undisclosed evidence constitutes exculpatory or impeachment evidence that is favorable to him, that is, if disclosed and used effectively, the evidence may make a difference between conviction and acquittal; and (3) the evidence is material, that is, it presents a reasonable probability that had the evidence been disclosed, the outcome of the proceeding would have been different. *Pena*, 353 S.W.3d at 809, 812; *Harm v. State*, 183 S.W.3d 403, 406, 408 (Tex. Crim. App. 2006). We analyze an alleged *Brady* violation "in light of all the other evidence adduced at trial." *Hampton v. State*, 86 S.W.3d 603, 612–13 (Tex. Crim. App. 2002).

We review a trial court's ruling on a motion for new trial for an abuse of discretion. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007); *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). We view the evidence in the light most favorable to the trial court's ruling and uphold it if it was within the zone of reasonable disagreement. *Webb*, 232 S.W.3d at 112. We do not substitute our judgment for that of the trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable. *Id.*; *Holden*, 201 S.W.3d at 763.

**PROCEDURAL AND FACTUAL BACKGROUND**

In 2009, the State charged Appellant with sexually assaulting S.P., a child younger than fourteen years of age, on two occasions in 2008. On August 9, 2010, Appellant waived a jury trial and pleaded guilty to the two counts without a

recommendation on punishment. Following Appellant's plea, the prosecutor advised that,

> initially during her disclosures the victim only disclosed two incidents of aggravated sexual assault, and that's why the indictment has two counts. However, I spoke with the victim last Monday and she disclosed sexual misconduct on the part of [Appellant] from age nine to age twelve, and I immediately picked up the phone to call [defense counsel] who wasn't available at the time, but I did send him an e-mail just to satisfy my *Brady* duties.

Appellant acknowledged receiving the email. The trial court stated that he would grant Appellant a recess before his cross-examination of S.P. if he needed one.

The next day, the State presented evidence that twelve-year-old S.P. delivered a baby boy at a local hospital in May 2009. After initially claiming she did not know who the baby's father was, S.P. reluctantly told a nurse that the baby's father was her stepfather, Appellant. The nurse contacted CPS, and subsequent DNA testing confirmed that Appellant was the baby's father.

CPS Investigator Kathy Meyer testified that she met with S.P. at the hospital after the baby's birth and that S.P. described in detail—once to Meyer and once to Meyer and Detective Alan Killingsworth—how Appellant had sexual intercourse with her two times between June and September 2008 at their home, where they lived with S.P.'s four half-siblings and Appellant's parents and brother.

Ashlee Bowles testified that she was a CPS caseworker for this family and that she met with Appellant in April 2010 while he was incarcerated. Appellant

4

told Bowles that he was "cracked out" when the abuse occurred and that it never would have happened "at least six times" if he had been sober.

The next day, Appellant objected to any testimony by S.P. regarding any sexual abuse not alleged in the two-count indictment, asserting that he had requested notice of extraneous offenses a year earlier (which the State disputed). The prosecutor reiterated that she had not been aware of the additional sexual abuse until the Monday before, when S.P. told her. The prosecutor explained that she had called Appellant's counsel that same day, and upon learning that he would be out of the office for a few days, she sent him an email. Defense counsel, having previously acknowledged receiving the email, stated that he did not think the State had acted in bad faith but that "the purpose of the notice is to allow us to prepare" and that "if we know simply that there's sexual abuse and don't know anything else, I don't know how we can prepare." The trial court ruled that, in light of caseworker Bowles's unobjected-to testimony that Appellant had admitted to six incidents of abuse, he would allow S.P. to testify to six incidents and that he would grant Appellant a continuance before cross-examination if requested.[3]

---

[3]We note that the trial court offered Appellant a continuance after Appellant objected that he had not received 404(b), 37.07, and 38.37 notice of the extraneous offenses. *See* Tex. R. Evid. 404(b); Tex. Code Crim. Proc. Ann. arts. 37.07 (West Supp. 2011), 38.37 (West Supp. 2011). The nondisclosure of 3,000 pages of CPS documents had not yet been discovered, therefore, it could not have been the basis for a continuance. We do not find persuasive the State's assertion that Appellant failed to preserve error on his *Brady* claim for failing to seek a continuance at this juncture.

S.P. testified that Appellant first touched her inappropriately when she was nine years old. When the prosecutor asked about other instances, S.P. responded, "Well, I know that it happened almost all the time." S.P. then testified that Appellant first had sexual intercourse with her when she was eleven years old. S.P. described the incident and explained that she was shocked the first time but that as she got older she "just g[o]t used to it." S.P. testified that a CPS caseworker came to their house in 2008 (in response to a referral of five children living in a dilapidated house) and that the caseworker told Appellant to stop sleeping in the same bed as S.P. In response, Appellant began picking up S.P. from school early and having intercourse with her in her grandmother's bed when no one was home but an uncle. S.P. testified that Appellant "put his penis inside [her] privates" the same summer that she became pregnant and that the last time was one week before the baby was born. The prosecutor then elicited testimony from S.P. that she told "the CPS person" that it only happened twice because she was scared, because she did not want anything bad to happen to her stepfather, and because she did not want her brothers and sisters to get hurt and hate her.

On cross-examination, Appellant elicited from S.P. that she gave a November 2009 videotaped interview and that she did not tell the CPS interviewer about the other sexual abuse incidents about which she had testified. When Appellant tried to introduce the DVD as impeachment evidence, however, the State objected that he had not laid the proper predicate, and the trial court agreed. Appellant then elicited testimony from S.P that she told both Kathy

6

Meyer and Detective Killingsworth at the hospital that the sexual abuse happened on only two occasions. He also elicited the following testimony:

> [Defense Counsel]: Q. And so then you — you went ahead and told them at that time that you were telling the truth; is that right?
>
> [S.P.] A. Yes, sir.
>
> Q. But today you're saying that that really wasn't the truth; is that right?
>
> A. Sir, it was the truth. But honestly, I didn't want to tell everything because I don't like to get people in trouble.
>
> . . . .
>
> Q. [Y]ou later had a chance to talk to CPS and did talk to CPS. Right?
>
> A. Yes, sir.
>
> Q. And you never explained any of this to them at that point in time, did you?
>
> A. No, sir.

When S.P. finished testifying, Appellant's counsel asked for a short recess but stated, "I don't contemplate asking — I don't want a continuance, I want to get it done, but I don't want to —."

When the hearing resumed, Laura Greuner testified that she was a licensed clinical social worker and S.P.'s therapist. Greuner testified that she diagnosed S.P. with Post-Traumatic Stress Disorder (PTSD) and explained that PTSD "is an anxiety disorder that people get when they go through serious traumas where [either their] life is threatened or the integrity of their body is

7

threatened. And that's how sexual abuse comes into it." Greuner testified that S.P. exhibited signs that were consistent with sexual abuse, such as anxiety and nightmares. Greuner testified that S.P. will have issues associated with her stepfather's sexual abuse for the rest of her life. On cross-examination, Appellant's counsel elicited testimony from Greuner that S.P. would be able to "have times when she enjoys a normal life just like she does now."

In his case in chief, Appellant presented evidence that he had an IQ of 77, placing him in the borderline range of intellectual functioning; that he could be a productive citizen if provided structure and supervision; that he had been a hard worker at times; and that he had been a good father in many respects. Appellant's defense counsel argued the following in closing argument:

> [T]he evidence establishes without any doubt that he's — that he's guilty of this offense. So we don't argue with that. That's why we pled guilty. I think the evidence supports that.

> However, as the Court knows from my evidence in court, this late-breaking evidence of other bad things that's just appeared recently the last week is something that I think that the Court in judging credibility can rightly give little weight to because I think — I'm suspicious anytime evidence appears just at the last minute. And I think the Court would be warranted in being suspicious of the evidence that appears at the last minute about other things that supposedly happened that weren't known and weren't talked about.

> [T]he testimony of Detective Killingsworth and Kathy Meyer and the nurse about what was said to them by [S.P.] and about these two experiences that Maureen has talked about is quite specific.

> . . . .

> When you have somebody at the time giving that — those details and giving it right after something dramatic like giving birth has

8

occurred, I think you've got reliability and trustworthiness in those statements to a certain extent, but I think you have — you have that especially when you have the details.

This other late-breaking stuff, I would just ask the Court not to — not to give that — I'd ask don't give it any weight. But for whatever it is, it certainly never appeared — none of the other State's witnesses said anything about it, so I think it's to be given little weight.

One week later, the trial court found Appellant guilty on both counts and sentenced him to two consecutive life sentences. On September 16, 2010, Appellant filed a motion for new trial, and the trial court held a hearing on October 1, 2010.

At the motion for new trial hearing, Appellant's counsel elicited testimony from attorney Joe Steimel that Steimel represented Appellant in his civil parent-child termination proceedings. Steimel testified that on August 5, 2010, during Appellant's punishment hearing, he received an email from an assistant district attorney who represented CPS, stating that the "de-identified file" was ready. Steimel testified that six or seven days later he picked up the records, that he was told that there were 3,300 pages of documents, and that he had provided those documents to Appellant shortly before Appellant filed his motion for new trial on September 16, 2010.

The lead prosecutor testified that the District Attorney's Office had an open file policy except that "as criminal district attorney we represent [CPS], and they are separate and apart from the felony prosecutors or the misdemeanor prosecutors." The prosecutor testified that there were two proceedings pending

against Appellant—the criminal proceeding and the CPS petition to terminate his parental rights. She explained that she had "nothing to do with" the civil side of the office representing CPS because "the civil side of our office that represents the [CPS] has attorney/client privileges, and I certainly don't want to divulge any information that is exchanged between the attorney and [CPS]." The prosecutor explained that she subpoenaed CPS records related to Appellant's case directly from the custodian of records for CPS and did not "go over to the other side of the office to get any records," "to cover [herself] with regard to *Brady* and [her] duties as an attorney" and to "cover [herself] that [she] requested everything that's related to the criminal case to [her] office so that it [could] be viewed by the defense."

The prosecutor testified that at some point Appellant's counsel subpoenaed essentially the same records and that a CPS representative called and asked the prosecutor to provide Appellant's counsel with a copy of the documents already provided to the prosecutor by CPS. Appellant's counsel agreed, and the prosecutor provided copies of all the CPS documents she had received from CPS, which was approximately 150 pages.

**ANALYSIS**

Appellant contends that the trial court erred by denying his motion for new trial. The basis of Appellant's claim is that, after his sentencing hearing, he discovered (based on documents received from his civil, termination attorney) that the prosecution had failed to disclose 3,000 pages of impeaching and

10

exculpatory documents (that were, at all pertinent times, located in the files of the Criminal District Attorney's Office) and that, therefore, the State violated the dictates of *Brady v. Maryland*.[4]  Despite Appellant's reference to exculpatory materials, he does not identify or discuss any undisclosed exculpatory evidence. Thus, we address only the impeachment value of the undisclosed documents.

The due process clause requires the prosecution to disclose only evidence that is (1) favorable to the defendant and (2) material either to guilt or punishment.  *United States v. Bagley*, 473 U.S. 667, 674, 105 S. Ct. 3375, 3379 (1985); *Brady v. Maryland*, 373 U.S. at 87, 83 S. Ct. at 1196–97.  Because Appellant fails to demonstrate that the documents were material to his guilt or punishment, the State was not obligated to disclose the documents to the defense.  We nonetheless briefly discuss the disclosure practices highlighted in this case.

---

[4]Citing *Ex parte Lewis*, Appellant asserts that "Texas recognizes that *Brady* protects persons accused of crimes from the withholding of material exculpatory and impeaching evidence even in the context of guilty pleas."  *See* 587 S.W.2d 697 (Tex. Crim. App. 1979).  In *United States v. Ruiz*, however, the United States Supreme Court held that neither *Brady* nor the federal constitution require prosecutors to disclose impeachment information prior to entering into a plea agreement with a defendant.  536 U.S. 622, 625–33, 122 S. Ct. 2450, 2453–57 (2002).  Because the State does not raise *Ruiz* and because addressing *Ruiz* is not necessary to the resolution of the issues as framed by the parties, we do not decide the applicability of *Ruiz* to Appellant's guilty pleas and three-day punishment hearing.  *See Ex parte Masonheimer*, 220 S.W.3d 494, 509 n.22 (Tex. Crim. App. 2007); *id.* at 513 n.20 (Keller, P.J., dissenting).

### First Brady Prong

Under *Brady v. Maryland*, the State has a constitutional duty to disclose to a defendant material, exculpatory and impeachment evidence in its possession. *See Pena*, 353 S.W.3d at 810. This duty also requires the State to learn of *Brady* evidence known to others acting on the State's behalf in a particular case. *Harm*, 183 S.W.3d at 406 (citing *Kyles v. Whitley*, 514 U.S. 419, 437–38, 115 S. Ct. 1555, 1567–68 (1995)); *Ex parte Mitchell*, 977 S.W.2d 575, 578 (Tex. Crim. App. 1997), cert. denied, 525 U.S. 873 (1998) (noting that *Brady* requires the State to disclose material exculpatory evidence in the possession of police agencies and other parts of the prosecutorial team). The State does not have such a duty if the defendant was actually aware of the evidence or could have accessed it from other sources. *Pena*, 353 S.W.3d at 810.

Although we decide this appeal on a different issue, two items in the record have given us pause. One of our concerns mirrors that expressed by the trial court at the new-trial hearing:

> THE COURT: [I]'m looking at the subpoenas that the State issued for pseudonym records, [Appellant's] records, and [his mother's] records. For the record, they were filed with the clerk on June the 15th. Each one reads as follows: Please furnish instanter any and all records pertaining to the following individuals, and then there's one for each of the three.
>
> Ms. [Prosecutor], do you have any reason why that broad request would not have included all records that CPS had? I mean, it doesn't say criminal prosecution, it doesn't say civil, it just names persons. I mean, it's obvious just from the volume of records that you didn't get everything you subpoenaed. I mean, I don't understand how that would — I mean, I think you subpoenaed them

12

and then the record indicates you gave [Appellant] just a copy of what you got. But —

[The State]: Right. I haven't compared the two. Although I've looked at the two —

THE COURT: Right.

[The State] — I haven't compared them side by side. But my intent was to receive any and all records —

THE COURT: Well, I mean, it's obvious that your records that you and [defense counsel] worked off of was about an inch thick and that other is a banker's box full of records.

[The State]: That's correct. But I don't know what records pertained to the other four children that I didn't reference in my subpoena or Baby [M] or any of that or the psychological or — I'm not quite sure.

THE COURT: So you're — are you — do you think State's Exhibit No. 1 [the undisclosed 3,000 pages of materials] then contains records referring to all the children?

[The State]: Yes.

THE COURT: It doesn't appear to me that [the CPS representative] honored the subpoena. So I would like in the future, rather than allowing CPS to provide the records by delivering them to an investigator, I want a CPS records custodian here to swear to the truth of it. And if it turns out it's not true, there's something the Court can do to enforce that. All right.

We are also concerned that the District Attorney's Office believes that an office policy—to keep its criminal case files "separate and apart" from its civil CPS case files—always absolves it from its *Brady* duties. *See Harm*, 183 S.W.3d at 407 ("While we have held that CPS case workers may be law enforcement officers or state agents in some circumstances, an examination of the entire record is

13

required to determine whether a CPS employee was a state agent in a given situation.") (footnotes omitted). Again, however, resolution of these two matters is not necessary to the disposition of this appeal.[5]  *See* Tex. R. App. P. 47.1.

### *Second Brady Prong*

To succeed on a *Brady* claim, Appellant must show that the evidence withheld by the State was "favorable" to his case.  Favorable evidence is that which, if disclosed and used effectively, "*may* make the difference between conviction and acquittal."  *Pena*, 353 S.W.3d at 811 (quoting *Bagley*, 473 U.S. at 676, 105 S. Ct. at 3375).  Favorable evidence includes impeachment evidence, which is evidence that disputes, disparages, denies, or contradicts other evidence.  *Id.* at 812; *Harm*, 183 S.W.3d at 408.

While Appellant makes much of the fact that the undisclosed documents total approximately 3,000 pages,[6] he did not highlight any information or specific documents within those 3,000 pages at the motion for new trial hearing or now on appeal, except for thirty-three pages of Greuner's therapy notes contained within the CPS documents.  Other than the Greuner notes, Appellant simply describes categories of documents contained within the voluminous records and

---

[5]We also decline to address the State's several arguments that Appellant had independent access to the documents and that the State therefore had no duty to disclose the challenged documents.  The facts underlying the parties' arguments are not entirely clear, and resolution of these arguments is not necessary to the disposition of the appeal.

[6]Appellant's counsel offered the documents as an exhibit.

14

does not point this court to any specific documents.[7] Thus, we address Appellant's arguments in the context of what we will refer to as the Greuner therapy notes. *See* Tex. R. App. P. 38.1(i); *Segundo v. State*, 270 S.W.3d 79, 106 & n.1 (Tex. Crim. App. 2008) (op. on reh'g) (reiterating that it is not an appellate court's task to wade through voluminous records to verify an appellant's claim), cert. denied, 130 S. Ct. 53 (2009); *see generally Gomez v. State*, No. 02-07-00284-CR, 2009 WL 806906, at *1 (Tex. App.—Fort Worth Mar. 26, 2009, pet. ref'd) (mem. op., not designated for publication) (overruling certain issues as inadequately briefed because appellant failed to "point this court to the specific documents on which he relies among the voluminous documents contained in the two boxes of sealed documents submitted to and held by this court").

Appellant asserts that the undisclosed documents are favorable because they would have "strengthened the proposition that the extraneous instances of sexual abuse did not occur at all" and that "[t]he Greuner therapy notes including

---

[7]Appellant states that the undisclosed documents included "among other things,"

> (1) [Dr. Greuner's] therapy notes and reports, (2) documents relating to alleged child sexual abuse supposedly endured by [S.P.'s] siblings, (3) documents detailing post-arrest CPS investigations of the entire [P.] household, including [Appellant's] brother DeWayne, (4) records of incriminating statements made by [Appellant] to Ashley Bowles, a CPS caseworker and trial witness, and (5) documents relating to the abuse of [M.P.], complainant's younger sister, allegedly inflicted by her paternal uncle, DeWayne, who lived with both S.P. and [A]ppellant.

15

statements by S.P. contradicted and called into question the extent of the abuse testified to at trial and undermined the credibility of S.P. and Greuner." Appellant does not, however, discuss specific statements contained in the Greuner notes, and he does not specify *how* he would have used the notes to challenge S.P.'s and Greuner's credibility.[8]  Indeed, our review of the notes indicates that, while arguably not as detailed as S.P.'s testimony regarding the extraneous sexual abuse, S.P.'s and Greuner's testimonies were generally consistent with the notes.[9]  Appellant does not point us to any portion of the notes that "dispute[d], disparage[d], denie[d], or contradict[ed]" S.P. or Greuner's testimony.  To the extent Appellant focuses on the omission of statements, he does not further explain or point us to any specific portion of the notes that support his argument. Further, Appellant does not explain how Greuner's therapy notes would have been admissible to impeach S.P. or Greuner; indeed, S.P. acknowledged that she had *not* told CPS about Appellant's ongoing sexual abuse.  *See* Tex. R. Evid. 613;[10] *see Pena*, 353 S.W.3d at 809 ("[W]e require that the evidence

---

[8]As the State points out, Appellant did not ask to see any of Greuner's notes related to her direct-examination testimony.  *See*, *e.g.*, Tex. R. Evid. 612, 613, 615.

[9]For instance, Greuner states in one set of notes from September 2009 that S.P. "talked about her dad.  She would beg him to stop molesting her.  She was afraid and told him so.  She kicked him once and he did stop so she wonders why she couldn't make him stop. . . .  She said on one occasion she awoke and he was strangling her."

[10]Rule 613(a) provides:

central to the *Brady* claim be admissible in court."); *Lempar v. State*, 191 S.W.3d 230, 240–41 (Tex. App.—San Antonio 2005, pet. ref'd) ("The State's duty under *Brady* does not extend to turning over evidence that would not be admissible at trial."). Thus, Appellant has not established that the undisclosed documents are favorable.

Even assuming that the undisclosed documents contained some impeachment value, however, Appellant's claims still fail because he is unable to satisfy the remaining materiality requirement.

### *Third Brady Prong*

To succeed in his *Brady* claim, Appellant must also show that that there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different. *Ex parte Adams*, 768 S.W.2d 281, 291 (Tex. Crim. App. 1989). Appellant asserts that "[t]he test applied to a defendant who enters a guilty plea is . . . whether the failure to produce the hidden material would have given rise to a reasonable probability that but for the failure to

---

In examining a witness concerning a prior inconsistent statement made by the witness, whether oral or written, and before further cross-examination concerning, or extrinsic evidence of, such statement may be allowed, the witness must be told the contents of such statement and the time and place and the person to whom it was made, and must be afforded an opportunity to explain or deny such statement. . . . *If the witness unequivocally admits having made such statement, extrinsic evidence of same shall not be admitted.*

Tex. R. Evid. 613(a) (emphasis added).

disclose the *Brady* material the defendant would not have entered the plea that he did." *See Tate v. Wood*, 963 F.2d 20 (2nd Cir. 1992). Appellant asserts generally that the undisclosed documents were material because he "never would have pursued the course and strategy that he did had he known of the undisclosed material."[11]

We note that while Appellant characterizes his criminal proceeding as a guilty plea for purposes of this materiality test, he later claims that his case "was in all other respects a contested punishment hearing."[12] To the extent Appellant's criminal proceeding can be characterized as a guilty plea, we determine whether he would not have entered a plea but would have gone to trial because of the objective likelihood of being found not guilty. *See Tate*, 963 F.2d at 24. "[T]he inquiry is an objective one that is resolved largely on the basis of the persuasiveness of the withheld evidence." *Id.* To the extent Appellant's punishment hearing was more like a trial, we determine whether in light of all the

---

[11]Appellant specifically argues that if the documentary evidence had been available and if he had known S.P. and Greuner would accuse him of additional misbehavior, he never would have waived his right to elect the jury to assess punishment, he may have testified in his own behalf, he may have called other family members or third-party witnesses, he could have investigated and called alibi witnesses, and he may have changed his plea in order to refute culpability and allow a jury to decide his fate.

[12]Citing *Ex parte Lewis*, Appellant asserts that in the context of *Brady* violations after guilty pleas, the court of criminal appeals has "found that the Due Process Clause and Texas' due-course-of-law provision both operate to support the granting of a new trial under comparable procedural circumstances." *See* 587 S.W.2d at 700. *Ex parte Lewis*, however, involved the failure to disclose exculpatory evidence. *Id.*; *see Ruiz*, 536 U.S. at 633, 122 S. Ct. at 2457.

evidence, it is reasonably probable that the outcome of the proceeding would have been different had the prosecutor made a timely disclosure. *See Pena*, 353 S.W.3d at 812. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial. *Harm*, 183 S.W.3d at 409. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109–10, 96 S. Ct. 2392, 2400 (1976); *see Pena*, 353 S.W.3d at 812. Ultimately, Appellant does not demonstrate that the undisclosed impeachment evidence was materially significant to either his guilty plea or to the outcome of his punishment hearing.

DNA testing confirmed that Appellant impregnated his twelve-year-old stepdaughter S.P. Appellant's trial counsel argued during the punishment hearing that "the evidence establishes without any doubt that [Appellant's] — that he's guilty of this offense. So we don't argue with that. That's why we pled guilty. I think the evidence supports that." While Appellant made this argument before he was aware of the undisclosed materials, he does not demonstrate objectively how or why his knowledge that S.P. did not disclose to CPS workers that she suffered ongoing sexual abuse by Appellant would have changed his plea. Thus, there is not a reasonable probability that but for the failure to produce the undisclosed information he would not have entered the plea but instead would have insisted on going to trial.

19

Further, S.P. testified to the impeaching facts; that is, she admitted on direct and cross-examination that she had omitted details of the extraneous incidents of sexual abuse when talking to CPS. "If the witness acknowledges impeaching facts during [her] testimony, nondisclosed information bearing on those facts is not 'material' under *Bagley*." 42 George E. Dix & John M. Schmolesky, *Texas Practice Series: Criminal Practice & Procedure* § 27:19 (3d ed. 2011) (citing *Etheridge v. State*, 903 S.W.2d 1, 20 (Tex. Crim. App. 1994)). Additionally, Appellant emphasized in his closing argument to the trial court that S.P.'s "late-breaking" testimony regarding the extraneous acts of sexual abuse should be viewed with suspicion and given little weight. *See Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000) (holding that undisclosed pretrial statement by victim's mother to investigator that defendant had not previously hurt the victim and would not sexually assault him was not material because the mother testified on direct examination to "materially the same" information and therefore the defendant was able to cross-examine her about the exculpatory facts); *Saldivar v. State*, 980 S.W.2d 475, 486 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) (holding that while defendant could have offered witness's theft conviction, if disclosed, to impeach her credibility with jurors, witness's inconsistent statements permitted defendant "to accomplish the same goal on cross-examination").

In light of the DNA results, the trial court could have understandably found S.P. credible when she testified that the sexual abuse happened more than twice

and when she explained why she did not report the ongoing abuse. In turn, the trial court could have reasonably found that S.P.'s earlier omissions regarding the ongoing sexual abuse did not undermine confidence in the outcome of the proceeding. Moreover, S.P.'s credibility was strengthened by the testimony of CPS caseworker Ashlee Bowles that Appellant recounted to her that he was "cracked out" when the abuse occurred and that it never would have happened "at least six times" if he had been sober. Thus, there is not a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.

For the above reasons, we hold that the trial court did not abuse its discretion by denying Appellant's motion for new trial, and we overrule Appellant's three issues.

## Conclusion

Having overruled Appellant's three issues, we affirm the trial court's judgments.

ANNE GARDNER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and MCCOY, JJ.

PUBLISH

DELIVERED: June 21, 2012

21