

## NUMBER 13-23-00329-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

ANDREW ALEXANDER PANTALEON,                                    Appellant,

v.

THE STATE OF TEXAS,                                    Appellee.

## ON APPEAL FROM THE 175TH DISTRICT COURT
## OF BEXAR COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Tijerina and Peña
Memorandum Opinion by Chief Justice Contreras**

Appellant Andrew Alexander Pantaleon challenges his conviction of aggravated assault with a deadly weapon, a second-degree felony. *See* TEX. PENAL CODE ANN. § 22.02(a)(2), (b). By four issues, Pantaleon argues that (1) the pretrial identification procedure used in the case violated his right to due process, (2) the trial court abused its discretion when it denied his motion to suppress testimony from the State's identification

witnesses, (3) the trial court erred when it denied his "motions for mistrial on two separate occasions," and (4) the trial court erred when it denied his request to view documents produced by the State under seal which could have included mitigating or exculpatory material. We affirm.

## I. BACKGROUND[1]

Sydney Bosworth was stabbed at the Palladium movie theater in San Antonio at approximately 11:00 p.m. on June 5, 2021. Six witnesses gave the bulk of testimony at trial: Bosworth herself, Detective Craig Rodriguez of the San Antonio Police Department (SAPD), and identification witnesses Stacy Sanchez, Alfredo Sanchez, Destiny Garcia, and Terry Marie Rejon.

Bosworth testified that during the movie, she exited the theater to use the restroom. After using the restroom and walking five or six steps into the theater, someone came up from behind her, pulled her close, reached their arm around her, and stabbed her multiple times in the chest, stomach, and arm. As the assailant fled, Bosworth turned around to see a short male who appeared Hispanic, had dark or black hair, and was "heav[y]" but not "fat." She quickly realized she could not move her right hand and the right side of her torso was bleeding. Bosworth exited the theater and began calling out for help, wherein two strangers helped her before medics and police arrived.

Detective Rodriguez was assigned to Bosworth's case. He interviewed Bosworth the day following the assault and retrieved video footage from the Palladium's security

---

[1] This case is before this Court on transfer from the Fourth Court of Appeals in San Antonio pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. §§ 22.220(a) (delineating the jurisdiction of appellate courts), 73.001 (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer). Because this is a transfer case, we apply the precedent of the Fourth Court of Appeals to the extent it differs from our own. *See* TEX. R. APP. P. 41.3.

cameras. Surveillance footage of Bosworth's assailant was admitted into evidence, which generally matched the description she gave, and showed the suspect wearing a black facemask, blue jeans, and a light blue shirt. Surveillance footage also showed the individual arrive and leave the Palladium in a black Toyota Corolla. Detective Rodriguez testified that, because the investigation did not lead to any suspects, the SAPD public information office created and circulated a short video using the Palladium's security footage of the individual. Eventually, Detective Rodriguez was contacted by Stacy Sanchez who recognized Pantaleon in the video because he had dated her sister, Destiny Garcia. Detective Rodriguez interviewed Stacy, her husband Alfredo, Garcia, and Rejon, another ex-girlfriend of Pantaleon. Detective Rodriguez testified that he showed each witness a photo of Pantaleon to identify and confirm that he was the same Pantaleon they thought was in the SAPD surveillance video.

Stacy testified about her experience identifying Pantaleon from the SAPD video circulated in the media. She testified that her husband texted her a screenshot of an image of a man and asked her if she recognized the subject of the photo. Stacy said she immediately recognized Pantaleon as the individual in the screenshot. After texting her husband that she thought the individual was Pantaleon, her husband informed her of "what was going on," and she immediately sent the screenshot to her sister and asked her if she could tell who was in the photo. Stacy testified that "[a]t first I was 99 percent confident that it was [Pantaleon]. The only one percent was that, you know, it's COVID times so he had a mask on." After watching the video surveillance footage posted by SAPD on social media, she became "one hundred percent" certain the individual in the footage was Pantaleon because she could "see [his] full body and see the way he walked

3

and the body language and what he was wearing." Stacy testified that she interacted with Pantaleon many times over the course of his relationship with her sister. At one point, Pantaleon lived with her sister at their parents' house, so Stacy saw him at "family functions, and gatherings and dinners and such." She testified that Pantaleon "tended to wear the same kind of attire around the family" such as a "[g]ray shirt, cowboy-style jeans . . . [with] big pockets in the back" and "[a] necklace chain," which she said was consistent with the clothes worn by the individual in the SAPD video. She also testified that the individual's glasses were consistent with glasses Pantaleon wore.

Stacy's husband, Alfredo, testified similarly. He said he found a local news story about the assault and a picture of the suspect was included in the story. He said he recognized Pantaleon as the suspect in the photo immediately and texted a screenshot of the photo to his wife. Alfredo explained that he had been around Pantaleon about "three, four times a week" for about two years when Pantaleon was dating his sister-in-law. Alfredo said he could identify Pantaleon from the photo in the news article, and later, the SAPD surveillance video, based on "[his] mannerisms, what [he wore] on a consistent basis from the hair to the glasses" and "the way he has his hands on his face, his shirt. . . . his pants, just his statu[r]e, how he's . . . built."

Garcia, Stacy's sister, testified that she was in a romantic relationship with Pantaleon from about 2019 to 2020, and the two dated on and off again throughout 2021. Garcia said they were not together at the time of the assault in June 2021. She said she could tell "immediately" that Pantaleon was the subject in the screenshot her sister texted her. After viewing the screenshot, Garcia watched the video surveillance footage put out by SAPD on social media. She testified that she could tell the suspect in the video was

4

Pantaleon from "[h]is demeanor, how he was holding his mask, how he was walking, [and] what he was wearing." Garcia testified that she was familiar with Pantaleon's wardrobe and has seen him "several times" in the outfit depicted on the suspect in the video. She said that the light blue shirt was one of his "everyday" shirts, and he often wore it "when [they] were going out." Garcia said she could tell it was Pantaleon even though he wore a facemask because she had seen him many times in a facemask when they dated during the COVID-19 pandemic.

Garcia also testified that Pantaleon called her on FaceTime on the night of the assault. From the FaceTime video, Garcia could tell Pantaleon was driving his mother's black Toyota Corolla because it had the same interior "black leather [seat] covers" as his mother's car. She also noticed that he was wearing a light blue shirt. Garcia said that Pantaleon told her "he [wa]s going to pick up his brother and his girlfriend [] at the club." Garcia said she hung up immediately because she was upset that he was calling in the middle of the night and she had work in the morning. She further testified that, after identifying Pantaleon as the individual in the SAPD surveillance video, she quickly realized that the FaceTime call was the same night as the assault.

The State's last identification witness was Rejon. Rejon testified that she went to high school with Pantaleon, and a few years later, the two dated for a year. Rejon said she was no longer in contact with Pantaleon and had not seen him since they broke up around February 2018 or 2019. Rejon testified that she was contacted by a detective from SAPD who asked her if she had seen the surveillance video of the suspect. Rejon told the detective that she had seen the news about the assault and the video. Initially, she thought that the person in the video "seemed familiar" but no one came to mind. Rejon

5

said, "[the detective] had asked me if I knew an individual named Andrew Pantaleon, and that's when I just put, you know, two and two together and saw that it was him in the video." Rejon stated that after viewing the surveillance footage again, she could tell the individual in the video was Pantaleon because the suspect had an "outfit that [Pantaleon] wore constantly all the time," including "a silver cross necklace," "a light blue shirt with blue jeans[,] and his boots." She also recognized Pantaleon's hair style. After her phone conversation with the detective, Rejon went to the police station and viewed more surveillance footage of the suspect. She testified that after this, she became "[a] hundred percent" certain that Pantaleon was the individual in the video.

After Pantaleon became a suspect, Detective Rodriguez found a black 2010 Toyota Corolla registered to Pantaleon's father. Detective Rodriguez then recovered surveillance footage from a local business, Van Delden Wastewater System, depicting what he believed was the same vehicle on the night of the assault. Using maps entered into evidence, Detective Rodriguez testified that Van Delden is "very close" to where Pantaleon lived with his parents, and to get to the Palladium, Pantaleon had to drive directly past Van Delden. Detective Rodriguez also obtained a search warrant for Pantaleon's parents' house, and police seized "[c]lothing, jeans, boots, shoes, knives, [and a] pair of glasses" from Pantaleon's bedroom. None of the shirts recovered in the search matched the suspect's light blue shirt in the surveillance video. The Toyota Corolla was also searched, and no evidence linking Pantaleon to the assault was found there.

Lastly, FBI special agent Ryan Hammer provided expert testimony regarding Pantaleon's location based on his cell phone records obtained from AT&T. Agent

6

Hammer testified that, according to the data, Pantaleon's cell phone was at the Palladium at various times on the night of the assault.

The jury found Pantaleon guilty and sentenced him to sixteen years' imprisonment. This appeal followed.

## II. PRETRIAL IDENTIFICATION PROCEDURE

By his first issue, Pantaleon argues that "the entire sequence of events leading to [his] identification [we]re irreparably suggestive and led to a substantial likelihood of misidentification," violating his right to due process. By his second issue, Pantaleon argues the trial court erred when it denied his motion to suppress the "unconstitutional" testimony from Stacy, Alfredo, Garcia, and Rejon.

### A. Standard of Review & Applicable Law

"A pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law." *Jones v. State*, 944 S.W.2d 50, 51 (Tex. App.—Texarkana 1997, pet. ref'd); *see Barley v. State*, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995). The defendant must show by clear and convincing evidence that the in-court identification has been irreparably tainted to obtain reversal. *See Balderas v. State*, 517 S.W.3d 756, 792 (Tex. Crim. App. 2016).

When determining the admissibility of a pretrial identification, we apply a two-step analysis wherein we ask: (1) whether the pretrial procedure was impermissibly suggestive, and if so, (2) whether the suggestive pretrial procedure gave rise to a substantial likelihood of irreparable misidentification. *Barley*, 906 S.W.2d at 33 (first citing *Simmons v. United States*, 390 U.S. 377, 384 (1968), and then citing *Cantu v. State*, 738

7

S.W.2d 249, 251 (Tex. Crim. App. 1987)). If we find that the pretrial identification procedure was impermissibly suggestive, we then assess "the reliability of the identification under the totality of the circumstances" and weigh five nonexclusive factors against the "corrupting effect of any suggestive identification procedures." *Balderas*, 517 S.W.3d at 792. Those five factors are: (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.*; *see also Neil v. Biggers*, 409 U.S. 188, 199–200 (1972). Thus, even if the pretrial procedure was impermissibly suggestive, the identification testimony will be deemed reliable, and therefore admissible, if the totality of circumstances reveals no substantial likelihood of misidentification. *Balderas*, 517 S.W.3d at 792; *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999); *see also Barley*, 906 S.W.2d at 33–34.

Generally, we review a trial court's ruling on the admissibility of evidence for abuse of discretion. *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020). However, "[w]e apply a de novo standard of review to determine whether an identification procedure was so impermissibly suggestive that it gave rise to a very substantial likelihood of misidentification." *Sierra v. State*, 266 S.W.3d 72, 75 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd); *see Loserth v. State*, 963 S.W.2d 770, 773–74 (Tex. Crim. App. 1998). We consider the five nonexclusive factors, "which are issues of historical fact, deferentially in a light favorable to the trial court's ruling." *Balderas*, 517 S.W.3d at 792 (citation omitted).

**B.** **Analysis**

Pantaleon argues by his first issue that Detective Rodriguez's use of a single photo to identify Pantaleon to witnesses Alfredo, Stacy, Garcia, and Rejon was impermissibly suggestive and gave rise to a substantial likelihood of misidentification. He also argues that when Alfredo texted the screenshot of the suspect to Stacy, and Stacy texted the same image to Garcia, this process was "cumulatively" impermissibly suggestive because "[i]f someone is texting a screenshot of a suspect in a surveillance video to a family member, that person will likely presume that he/she knows the person in the image."

Assuming, without deciding, that the pretrial identification procedure was impermissibly suggestive, we nevertheless conclude that Pantaleon has failed to show by clear and convincing evidence that the process gave rise to a substantial likelihood of irreparable in-court misidentification. In weighing the five nonexclusive factors to determine the reliability of the identification, we find that all four witnesses' extensive time interacting and observing Pantaleon outweighs any corrupting effect of Detective Rodriguez's use of a single photo to identify Pantaleon to the witnesses. Each witness had ample opportunity to view the SAPD surveillance footage of the suspect at the scene of the crime; testified extensively about details identifying the individual as Pantaleon, including his clothes, movement, body type, haircut, glasses, posture, and general demeanor; testified that they were "one hundred percent" certain that the suspect they saw in the SAPD video was Pantaleon; and, with the exception of Rejon, identified Pantaleon immediately upon seeing the SAPD image and surveillance video. *See Thomas v. State*, 470 S.W.3d 577, 590–92 (Tex. App.—Houston [1st Dist.] 2015), *aff'd*, 505 S.W.3d 916 (Tex. Crim. App. 2016) (analyzing the five factors and holding that the

State's pretrial photo array did not create a substantial likelihood of irreparable misidentification, particularly due to the identifying witness's ability "to describe the offense in detail" and his consistent display of "a high degree of certainty that appellant was the perpetrator of the offense").

Significantly, each witness had years of experience observing and interacting with Pantaleon and explained at trial what identifying factors they attributed to Pantaleon from the SAPD surveillance video. For example, even though Rejon did not recognize Pantaleon from the video at first, she went on to describe specific details which she noticed that made her recognize him, including his haircut, his clothes, and a silver cross necklace. As to Pantaleon's contention that the testimony of Stacy and Garcia was automatically "tainted" because receiving an image from a family member is irreparably suggestive, he cites no caselaw supporting such a proposition, and we find none. Further, both Stacy and Garcia testified that when they received the image, the sender did not suggest that it was of appellant. Assessing the totality of the circumstances, we conclude the State's pretrial identification procedure did not give rise to a "very substantial likelihood of irreparable misidentification." *See id.* We overrule Pantaleon's first issue.

As to his second issue, Pantaleon argues that the trial court erred when it denied his motion to suppress the "unconstitutional" testimony from Stacy, Alfredo, Garcia and Rejon. However, Pantaleon's second argument is largely the same as his first—that the State's identification procedure was unconstitutional because Detective Rodriguez used a single image of Pantaleon with the identification witnesses. Because we find that the State's identification procedure did not give rise to a substantial likelihood of irreparable misidentification, we likewise overrule his second issue. *See Matter of M.I.S.*, 498 S.W.3d

10

123, 133 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (overruling appellant's challenge to the victim's in-court identification because his argument stood on the same pretrial identification errors as his previous argument, which the court had already overruled due to his "failure to demonstrate a substantial likelihood of irreparable misidentification"); *Cienfuegos v. State*, 113 S.W.3d 481, 492 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (holding "that the trial court did not err in denying appellant's motion to suppress [the victim's] pretrial lineup identification and her in-court identification of appellant" because appellant did "not show[] by clear and convincing evidence that the pretrial lineup procedure was impermissibly suggestive").

### III. MOTIONS FOR MISTRIAL

By his third issue, Pantaleon argues that the trial court erred when it denied his two motions for mistrial.

### A. Applicable Law & Standard of Review

"A mistrial is an appropriate remedy in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) (quoting *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)). "Because it is an extreme remedy, a mistrial should be granted 'only when residual prejudice remains' after less drastic alternatives are explored." *Ocon*, 284 S.W.3d at 884–85 (quoting *Barnett v. State*, 161 S.W.3d 128, 134 (Tex. Crim. App. 2005)). Even if inadmissible testimony or other evidence comes before the jury, "our law prefers that the trial continue" unless the evidence "is so emotionally inflammatory that curative instructions are not likely to prevent the jury being unfairly prejudiced against the defendant." *Bauder v. State*, 921 S.W.2d 696, 698 (Tex. Crim. App. 1996).

11

We review a trial court's denial of a motion for mistrial under an abuse of discretion standard. *Archie v. State*, 340 S.W.3d 734, 738–39 (Tex. Crim. App. 2011). In reviewing a trial court's ruling on a motion for mistrial, we must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Archie*, 221 S.W.3d at 699; *Ocon*, 284 S.W.3d at 884 (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)). An appellate court views the evidence in the light most favorable to the trial court's ruling, considering only those arguments before the court at the time of the ruling. *Ocon*, 284 S.W.3d at 884.

## B. First Motion for Mistrial

Pantaleon first requested a mistrial outside of the presence of the jury after Garcia testified. When Garcia was released, the State turned over evidence of an unadjudicated theft offense that was in Garcia's criminal history file. The following exchange occurred on the record:

[The State]: I just have an issue, Judge. [The] Court had ruled in the discovery motion for the State to provide and the State agreed to provide the NCIC criminal histories of witnesses prior to them stepping onto the stand. Without any malice or willful intention, I forgot to hand over the criminal history of Destiny Garcia yesterday prior to her testifying. Within that document is an unadjudicated theft arrest that predates this offense.

It is the State's position that [it] would have been [an] inadmissible prior conviction [be]cause it is not a conviction and would have been an—inadmissible for impeachment purposes or specific instances of conduct, but as soon as I recognized the error, which was right before we broke, I handed it to Defense. I informed the Defense, I informed the Court. I'm putting it on the record now. It was a pure accident and not my intent, but I just want everyone to know that I have it.

| THE COURT: | Okay. At this time that's an accurate reflection of what occurred. I mean, she's already testified, so. . . . [Defense] can put it on the record if that—it's a problem and take— |
| --- | --- |
| [Defense]: | Sure, Judge, and it was a kind—crime of moral turpitude. It was given to us after [Garcia] . . . . testified and we believe that would have been material in the cross-examination to attack her credibility as her credibility is in question in this trial. |

Defense counsel then made a motion for mistrial, which the court denied.

Pantaleon argues that the unadjudicated theft offense in Garcia's criminal history was favorable to him and material to his case, thus making it impeachment evidence subject to mandatory disclosure under *Brady*. *See Ex parte Kimes*, 872 S.W.2d 700, 702 (Tex. Crim. App. 1993) (first citing *Brady v. Maryland*, 373 U.S. 83 (1963); and then citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)) (noting that a prosecutor has an affirmative duty to turn over material, exculpatory evidence, including impeachment evidence). He argues that the State's failure to turn over this impeachment evidence violated his due process rights, thereby requiring the judge to grant a mistrial.

The State does not dispute that it should have turned over Garcia's criminal history to defense counsel prior to trial. It argues, however, that Garcia's unadjudicated theft arrest would have been inadmissible as impeachment evidence. We agree. Generally, a witness's unadjudicated crime is not admissible to impeach a witness's character for truthfulness under Texas Rule of Evidence 609 unless the "witness whom the State calls is subject to a criminal charge, or is on probation," and the witness's unadjudicated criminal charge "can be used to show the bias or interest of the witness in helping the State." *Moreno v. State*, 22 S.W.3d 482, 485–86 (Tex. Crim. App. 1999); *see Maxwell v. State*, 48 S.W.3d 196, 199 (Tex. Crim. App. 2001), *overruled on other grounds by Irby v.*

13

*State*, 327 S.W.3d 138 (Tex. Crim. App. 2010); *Caldwell v. State*, 356 S.W.3d 42, 50 (Tex. App.—Texarkana 2011, no pet.); *Arroyo v. State*, 123 S.W.3d 517, 519 (Tex. App.—San Antonio 2003, pet. ref'd); *see also* TEX. R. EVID. 404, 609.

There is no dispute that Garcia's unadjudicated theft offense predated the offense in this case, and nothing in the record indicates that this unadjudicated offense shows Garcia's bias or interest in helping the State. *See Moreno*, 22 S.W.3d at 485–86. We conclude that the State's belated disclosure of the offense does not fall within the narrow class of highly prejudicial and incurable errors that warrant a mistrial. *See Ocon*, 284 S.W.3d at 884. Accordingly, the State's failure to produce evidence of the offense did not violate due process and the trial court did not abuse its discretion when it denied Pantaleon's first motion for mistrial. We overrule this sub-issue.

## C.     Second Motion for Mistrial

Before Detective Rodriguez testified in front of the jury, the trial court granted Pantaleon's motion in limine to limit testimony regarding how Detective Rodriguez found Rejon during the investigation. The court allowed Detective Rodriguez to testify that he located Rejon through "an investigation" but ruled that the specifics of that investigation could not be mentioned during questioning. Then, the following exchange occurred:

| [The State]: | [C]an you walk the jury through kind of what your first conversation was like with [Rejon]? |
|---|---|
| [Rodriguez]: | It was on the telephone. It was about an incident. You know, being a detective, we look through—we do research on—obviously the Defendant and— |
| [The State]: | [A]nd she was just an ex-girlfriend right? |
| [Rodriguez]: | Correct, she was just an ex-girlfriend, and I contacted her to speak to her about an incident that she was involved with. |

14

Defense counsel interjected immediately and requested a bench conference, contending that Detective Rodriguez had violated the motion in limine. Defense counsel moved for a mistrial and requested a limiting instruction, but then withdrew the request for the limiting instruction. The trial court denied the motion for mistrial and then admonished Rodriguez off the record and outside the presence of the jury.

Assuming that Rodriguez's testimony violated the motion in limine, we look to whether the trial court erred in denying Pantaleon's motion for mistrial. In doing so, we balance the *Mosley* factors: (1) the severity of the misconduct (i.e., the prejudicial effect), (2) any curative measures issued by the court, and (3) the certainty of conviction absent the misconduct. *Saldivar-Lopez v. State*, 676 S.W.3d 851, 857–58 (Tex. App.—Corpus Christi–Edinburg 2023, no pet.); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

Here, the severity or the prejudicial effect of Rodriguez's statement was low. Detective Rodriguez did not detail what "incident" he was referring to. The State did nothing to emphasize the testimony concerning the "incident" Rejon was involved in, and it did not mention the testimony in its closing argument. *See Martinez v. State*, 17 S.W.3d 677, 693 (Tex. Crim. App. 2000); *Perez*, 187 S.W.3d at 112–13 (considering whether the mistake was repeated, whether it seemed inadvertent or intentional, and the nature of the right affected in the court's analysis of the first *Mosley* factor). This factor weighs against a mistrial.

As to curative measures, Pantaleon argues that "there was no cure for this reversible error" because the above exchange "was so clearly calculated to inflame the minds of the jury or is of such damning character as to suggest it would be impossible to

15

remove the harmful impression from the jury's mind." *See Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992). However, as previously stated, the severity or prejudicial effect of Detective Rodriguez's statement was low, and thus, was not so clearly calculated to inflame the minds of the jury. *See id.*; *Young v. State*, 283 S.W.3d 854, 878 (Tex.Crim.App.2009) (holding that "[t]he trial court could have reasonably concluded that the" officer's mention that appellant's gun was stolen "was not so inflammatory as to be incurable by an instruction to disregard"); *see also Fonseca v. State*, No. 13-11-00367-CR, 2013 WL 1281869, at *3 (Tex. App.—Corpus Christi–Edinburg Mar. 28, 2013, no pet.) (mem. op., not designated for publication) (holding witness's reference to appellant's past incarceration was not so calculated as to inflame the minds of the jury even without an instruction to disregard by the trial court). This factor weighs against a mistrial.

Lastly, regarding the certainty of conviction absent the misconduct, any prejudicial effect that the testimony may have had was minuscule when compared to the strength of the evidence supporting the conviction. Pantaleon argues that, "[o]ther than the tainted identification testimony, there is almost no other evidence of Pantaleon's guilt." While there is no physical evidence linking Pantaleon to the crime, four witnesses positively identified Pantaleon from the SAPD surveillance video of the crime. Garcia specifically testified that she saw Pantaleon on the day of the assault wearing the same clothes and driving the same car as the suspect in the surveillance video. Lastly, cell phone location data pinpointed Pantaleon to the scene of the crime. *See Archie v. State*, 221 S.W.3d 695, 700 (Tex. Crim. App. 2007); *see also Lyne v. State*, No. 13-13-00313-CR, 2015 WL 5672692, at *5 (Tex. App.—Corpus Christi–Edinburg Sept. 17, 2015, no pet.) (mem. op., not designated for publication) (finding that trial court did not abuse its discretion in

denying appellant's motion for mistrial given the strength of the evidence against appellant, which consisted mainly of the victim's testimony). This factor also weighs against a mistrial. We conclude the trial court did not err in denying Pantaleon's second motion for mistrial, and we overrule his third issue.

## IV.    ALLEGED EXCULPATORY MATERIAL

By his last issue, Pantaleon argues that the trial court erred when it denied his request to view sealed documents produced by the State because the documents could have included mitigating or exculpatory material. *See Brady*, 373 U.S. at 83.

Prior to trial, the State filed a motion with the trial court to seal certain documents. The trial court inspected the documents and granted the State's request. Pantaleon's defense counsel objected and requested to view the sealed documents. During a pretrial hearing, counsel stated that he was unaware of the contents of the sealed documents and argued that they might be exculpatory in nature or contain mitigating evidence. The trial court denied the defense's request, but ordered that the sealed records be made part of the court record for appellate purposes.

Pantaleon "requests this Court to conduct an in camera inspection of the sealed documents." He asks that if we find "the documents are relevant, exculpatory, or contain any mitigation evidence or other [relevant] evidence," that we reverse and remand for a new trial, "and order the trial court to allow counsel for the defense to review the sealed documents." However, Pantaleon had access to the sealed documents during this appeal. On April 17, 2024, the State filed a motion requesting access to certain electronic exhibits. Two days later, the Clerk of this Court e-mailed both the State and Pantaleon a link to an

17

online drive that contained all the requested electronic exhibits and a folder titled "Sealed," which contained the exhibits the State submitted under seal to the trial court.

"The due process clause requires the prosecution to disclose only evidence that is (1) favorable to the defendant and (2) material either to guilt or punishment." *Pitman v. State*, 372 S.W.3d 261, 268 (Tex. App.—Fort Worth 2012, pet. ref'd) (citations omitted). Pantaleon has not demonstrated that the documents are favorable or material in any way. *See id.* at 269 ("Because Appellant fails to demonstrate that the documents were material to his guilt or punishment, the State was not obligated to disclose the documents to the defense."). Nevertheless, this Court inspected the sealed documents, and we conclude that the trial court correctly determined that the documents contained no evidence that was either favorable or material to Pantaleon's defense. *See Keith v. State*, 916 S.W.2d 602, 606 (Tex. App.—Amarillo 1996, no pet.) (inspecting the documents produced under seal and holding "that the trial court correctly determined that the file contained no exculpatory, mitigating or favorable evidence that should have been, but was not, disclosed to appellant"). We overrule Pantaleon's fourth issue.

## V.    CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
15th day of August, 2024.