# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-22-00458-CR

---

**Andrew Jones, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 428TH DISTRICT COURT OF HAYS COUNTY
### NO. CR-19-0893-D, THE HONORABLE WILLIAM R. HENRY, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Andrew Jones was convicted of the offense of murder and sentenced to sixty-five years' imprisonment. *See* Tex. Penal Code §§ 12.32, 19.02. In two issues on appeal, Jones argues that the trial court erred by denying his motion for continuance and by overruling his objection to witness testimony regarding evidence that had been excluded. We will affirm the trial court's judgment of conviction.

## BACKGROUND

On April 5, 2019, Nicholas White made plans to socialize with a friend in his apartment at the Uptown Square Apartments in San Marcos, Texas. The friend arrived at White's apartment first and waited in the parking lot for White to arrive. When White drove up, the friends greeted one another and walked toward White's apartment. Before reaching the apartment, a man approached the friends and yelled something about money to White. White responded, "What are you going to do? Shoot me?" At that point, the man pulled out a gun and

shot White multiple times before getting into his car, speeding off, and nearly driving over White who had fallen to the ground. White's friend, residents of the apartment complex, and people visiting residents of the complex rushed to aid White, and the police and paramedics responded to a 911 call made at 6:36 p.m. reporting the shooting. Although the neighbors, police, and paramedics attempted to save White's life, he succumbed to his multiple gunshot wounds and died en route to the hospital.

While at the apartment complex, the police questioned White's friend and the neighbors and visitors about what they saw. The witnesses described the shooter as a "light-skinned African American" man who had tattoos on one of his arms, was wearing a yellow shirt, and had been smoking before the incident. Additionally, the witnesses informed the police that the shooter drove off in a silver SUV. While examining the scene, the officers noticed on the ground shell casings from .40 caliber Smith & Wesson ammunition and noticed that several projectiles had hit cars in the parking lot. As part of their investigation, the police collected the casings as well as cigarette butts that were found in the area.

Two of the responding officers contacted the manager for the Uptown Square Apartments to see if there was any surveillance footage of vehicles entering or exiting the complex near the time of the shooting. While watching the footage, the officers noticed a Nissan Rogue matching the witnesses' description of the shooter's SUV entering the complex at 6:15 p.m. By slowing down the footage, one of the officers was able to obtain the license plate number for the vehicle. The footage also showed the Nissan Rogue leaving the complex around the time of the shooting at 6:36 p.m., and the officers were able to observe that the driver entering the complex and later leaving was an African American man with a yellow shirt.

After running the plate number through a database, the officers learned that the vehicle belonged to a car-rental company. After the officers contacted the car-rental company, they learned that the SUV had been rented to Jones at 11:14 a.m. on April 5, 2019, and that Jones's address was unit 517 of another apartment complex in San Marcos called The Pointe. The officer used this information to search through driver's license records and found Jones's driver's license and his license photo. The photo was consistent with the witnesses' description of the shooter.

Police officers went to The Pointe complex and noticed the Nissan Rogue in the parking lot. One officer asked the apartment manager if there was any surveillance footage for individuals entering and leaving the complex that day. After the manager allowed the officer to review the footage, the officer observed a Nissan Rogue with the same license plate as the one from Uptown Square Apartments entering The Pointe complex at 6:49 p.m. When reviewing the footage, the officer noticed that no one other than the driver was in the car and that the driver had tattoos on his right arm.

Relying on this information, the police obtained an arrest warrant for Jones, and a SWAT team entered unit 517 at 5:30 a.m. on April 6, 2019. Jones was not inside the apartment. When searching the apartment, the police found in a bathroom a pistol box with a pawn receipt inside it and two Glock magazines with .40 caliber ammunition. The ammunition was consistent with the casings recovered from the scene of the shooting. The pawn receipt documented that Jones bought a .40 caliber Glock 27 in September 2018.

As part of the investigation, the police learned that Jones had recently moved into unit 517 after moving from unit 503. The police knocked on the door of unit 503 after failing to find Jones in unit 517, and one of the occupants and former roommates of Jones opened the door.

3

He explained to the police that when he arrived home the night before (April 5), he noticed in his trashcan a gun holster, two loaded gun magazines with .40 caliber ammunition, and some clothes. The police collected those items, including a yellow shirt, while talking with the occupant. The occupant also related that neither of his other roommates consistently locked the front door to the apartment or the lock to the door on the third-floor loft, and the occupant gave the police permission to search the apartment.

During the search of unit 503, the police learned that units 503 and 517 shared access to a rooftop deck and that from the rooftop someone could enter both units. While searching the loft where Jones used to live, the police found keys to the Nissan Rogue rented to Jones and prescription bottles with Jones's name on them.

After the police searched the apartments, Jones turned himself in. In July 2019, Jones was charged with murdering White by shooting him. Three years later, the trial began. During the trial, investigating police officers, paramedics, the owner of a pawn shop, and witnesses from Uptown Square Apartments testified regarding the events set out above. In addition, a forensic chemist testified that testing he performed on the gearshift and steering wheel of the Nissan Rogue showed gunshot residue on both locations, meaning that a gun had either been discharged near those portions of the vehicle or those parts of the vehicle contacted another surface that had gunshot residue on it. A firearm and toolmark examiner testified that the casings collected from the scene were all fired from the same weapon and that the weapon was made by one of a handful of manufacturers, including Glock. A DNA analyst explained that testing performed on one of the cigarette butts retrieved from the scene showed a single DNA profile for a man and calculated the probability of the profile coming from Jones as being 24.6 septillion times greater than if it came from an unrelated, unknown individual. Additionally, the

4

analyst testified that testing performed on a sample collected from the bumper of the Nissan Rogue showed a single DNA profile and calculated the probability of the profile coming from White as being 64.4 septillion times greater than if it came from an unrelated, unknown individual. Next, the analyst explained that testing of a swab from the yellow shirt collected in the investigation showed that the DNA profile was a mixture of three people and calculated the probability of obtaining the profile if Jones was one of the contributors as being 2.9 septillion times greater than if the sample came from three unrelated, unknown individuals.

Further, Officer David Campbell testified regarding his efforts during the investigation in the case, including his review of surveillance footage from The Pointe where Jones lived. In his testimony, Officer Campbell discussed what he saw on the footage, including seeing the Nissan Rogue entering the complex at 6:49 p.m., noting that only the driver was in the car, and stating that footage showed that the driver had tattoos on his right arm. Officer Chris Tankersley provided similar testimony regarding the footage. In addition, Officer Campbell said that photos taken of Jones after his arrest showed that he had tattoos on his right arm that looked like the driver's tattoos. Another officer testified that a phone logged into Jones's personal email account began moving at 6:12 p.m. on April 5, 2019, away from the apartment complex where Jones's girlfriend lived; that the phone moved toward the Uptown Square Apartments and was near the parking lot of the complex between 6:18 p.m. and 6:22 p.m.; that the phone stayed in the same location near White's apartment until 6:36 p.m.; that the phone began moving away from the Uptown Square Apartments at 6:38 p.m.; that the phone travelled toward The Pointe; and that the phone stopped near units 503 and 517.

After considering the evidence presented at trial, the jury found Jones guilty of murder. Jones appeals his conviction.

5

In his first issue on appeal, Jones contends that the trial court erred by denying his motion for a continuance. In his second issue, Jones asserts that the trial court erred by overruling his objection to witness testimony regarding surveillance footage from The Pointe.

**Motion for Continuance**

Prior to trial, on June 29, 2022, Jones filed a motion for continuance asserting that he was told that day that evidence was available in the prosecutor's office on a USB drive that had not been disclosed on any list of evidence provided or turned over to him. Jones asserted that the USB drive contained approximately 2,000 individual video files and related documents. At a hearing on the motion, Jones repeated his assertion that the USB drive and the files had not been disclosed to him and argued that he had no idea what was on the drive other than four videos that the State sent to him by email. Jones argued that the State should have turned over the files in response to his discovery request. Accordingly, Jones requested a continuance to review the contents on the drive.

In response, the State described the files as surveillance footage that was captured by motion-activated cameras at Jones's apartment complex about the time of the murder and showed "the comings and goings of residents at the" complex. Regarding Jones, the State asserted that four of the recordings previously disclosed documented his returning to the apartment complex shortly after the murder. Further, the State asserted that the videos were mentioned in a police report that had been provided in discovery. Specifically, the State discussed how Officer Campbell mentioned in his report that he talked with the manager of The Pointe where Jones resided, that the videos showed a Nissan entering the complex at 6:49 p.m.,

that the driver was an African American male with a "sleeved tattoo," that the manager recognized Jones as the driver, and that the only person in the car was the driver. Additionally, the State pointed out that Officer Campbell discussed in his report how another officer and he went to the apartment complex and that the other officer was able to download videos from the surveillance cameras made from 6:30 p.m. to midnight on the day of the murder. Although Officer Campbell explained that he attempted to download the files into the electronic evidence system used by the San Marcos Police Department, he wrote that there were errors in submitting the files, that most of the files had been downloaded, and that he was able to download all of the content onto a USB drive and submit it into evidence. The State mentioned that the USB drive was included in the list of evidence in the custody of the San Marcos Police Department.

Although the State recognized that the USB drive had not physically been given to Jones, it explained that the drive had been in evidence, that Jones had a report saying that the drive was in evidence, and that Jones could have but did not try to look at the evidence. Further, the State related that it moved the drive to the prosecutor's office to allow Jones even more of an opportunity to look at it in the lead-up to trial and that it had told Jones about the move. The State also related that the evidence on the drive would be the same as Officer Campbell's testimony describing what he saw when he watched the videos.

After considering the parties' arguments and highlighting how Jones had already been in jail for three and a half years, the trial court excluded the evidence from the USB drive and appointed an additional attorney to the defense team to review evidence on the drive to see if there was anything that might be helpful to the defense, but the trial court denied Jones's motion for a continuance. The additional attorney spent forty hours reviewing those files before trial, and the trial began approximately one week after the hearing.

When challenging on appeal the trial court's denial of his motion for continuance, Jones argues that the State's failure to turn over the flash drive sooner violated article 39.14 of the Code of Criminal Procedure and the requirements of *Brady v. Maryland* because the State failed to timely disclose the drive and its contents. *See* Tex. Code Crim. Proc. art. 39.14; 373 U.S. 83 (1963). Although Jones recognizes that the trial court ordered that the videos be excluded, Jones contends that the trial court's denial of his motion for continuance harmed him because it forced him to proceed to trial even though he had only been made aware of the USB drive with 2,000 files on it approximately one week before trial. Jones contends that the time between the disclosure of the drive and the start of trial was insufficient to properly review the files and that, therefore, proceeding to trial violated his due-process rights Moreover, Jones argues that the appointment of additional counsel to review the files did not mitigate the harm because the additional attorney was unfamiliar with the case and because the lead attorney on the case should have been allowed time to review the files given his familiarity with the case.[1] Finally, Jones contends that granting the continuance would not have prejudiced the State's case, particularly where the State had requested and been given a continuance earlier on in the proceedings.

To preserve a complaint regarding the denial of a motion for continuance, certain procedural steps must be complied with. Article 29.03 of the Code of Criminal Procedure requires that the motion be written and provides that the proceeding may be continued "upon sufficient cause shown, which cause shall be set forth in the motion." Tex. Code Crim. Proc. art.

---

[1] In his brief, Jones seems to suggest that the trial court should have allowed the additional attorney to assist throughout the remainder of the trial. However, Jones has not shown that he made that type of request and that the request was denied. *See* Tex. R. App. P. 33.1 (setting out requirements for preserving appellate complaint).

8

29.03. Further, article 29.08 mandates that a motion for continuance "be sworn to by a person having personal knowledge of the facts relied on for the continuance." *Id.* art. 29.08. When construing these statutory requirements, the Court of Criminal Appeals has determined that the statutes require "a sworn written motion to preserve review from a trial court's denial of a motion for continuance." *Anderson v. State*, 301 S.W.3d 276, 279 (Tex. Crim. App. 2009); *see Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012) (noting that "an unsworn oral motion preserves nothing for review"). There is no due-process exception to the requirement that a motion for continuance be written and sworn to preserve the issue for appeal. *Blackshear*, 385 S.W.3d at 591.

Although the term "sworn" is not defined in the relevant portions of the Code of Criminal Procedure, this Court has addressed the meaning of that term in this context and concluded that the statutory provisions "require some form of an oath, jurat, verification statement, or affidavit." *See Ruiz v. State*, No. 03-19-00551-CR, 2021 WL 3233858, at \*6 (Tex. App.—Austin July 30, 2021, no pet.) (mem. op., not designated for publication) (considering multiple dictionary definitions); *see also* Tex. Code Crim. Proc. art. 3.01 (noting that terms in Code are "to be taken and understood in their usual acceptation in common language, except where specially defined"); *Watkins v. State*, 619 S.W.3d 265, 272-73 (Tex. Crim. App. 2021) (explaining that appellate courts may consult dictionaries and legal dictionaries when attempting to determine fair meaning of undefined terms).

In this case, the motion for continuance lacked an oath, verification, attached affidavit, jurat, or similar equivalent. *Cf. Woodman v. State*, 491 S.W.3d 424, 428 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (noting that motion for continuance was written but not sworn and had no affidavit). Instead, Jones's attorney simply signed the motion after requesting

9

a continuance and again under the certificate of service. "[T]here is no statement or jurat declaring that the contents of the motion were subscribed and sworn to before [a] notary or made under oath or penalty of perjury." *Ruiz*, 2021 WL 3233858, at *6. "There is likewise no avowal that the contents of the motion are true." *Id.* Accordingly, Jones failed to preserve the issue for appellate review.

Even if the issue had been preserved for appellate consideration, we would be unable to sustain this issue. "The granting or denying of a motion for continuance is within the sound discretion of the trial court." *Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006); *see also* Tex. Code Crim. Proc. art. 29.06(6) (noting that motion for continuance "shall not be granted as matter of right"). Accordingly, "[w]e review a trial court's ruling on a motion for continuance for abuse of discretion." *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007). Under that standard, a trial court's ruling will only be deemed an abuse of discretion if it is so clearly wrong as to lie outside "the zone of reasonable disagreement," *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002), or is "arbitrary or unreasonable," *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). Under that standard, appellate courts review the record evidence "in the light most favorable to the trial court's ruling." *Ex parte Nelson*, 546 S.W.3d 742, 746 (Tex. App.—Houston [1st Dist.] 2018, no pet.). In the circumstances present here, "[t]o establish an abuse of discretion, there must be a showing that the defendant was actually prejudiced by the denial of the motion." *Splawn v. State*, 160 S.W.3d 103, 108 (Tex. App.—Texarkana 2005, pet. ref'd). Actual prejudice is not shown where the defendant "should have anticipated the possibility" of the claimed surprise. *Vasquez v. State*, 67 S.W.3d 229, 240 (Tex. Crim. App. 2002).

As set out above, Jones contends that the State failed to comply with the requirements of article 39.14 and *Brady* by failing to timely disclose the recordings. Article 39.14 requires the State "as soon as practicable" to "produce and permit the inspection and the electronic duplication, copying, and photographing, by or on behalf of the defendant" containing "evidence material to any matter involved in the action and that are in the possession, custody, or control of the state . . . ." Tex. Code Crim. Proc. art. 39.14(a). Similarly, *Brady* requires the State to disclose evidence that "is material either to guilt or to punishment." 373 U.S. at 87. Under article 39.14, the State is also obligated to "disclose . . . any exculpatory, impeachment, or mitigating" evidence "in the possession, custody, or control of the state . . . ." Tex. Code Crim. Proc. art. 39.14(h); *see also Watkins*, 619 S.W.3d at 277 (noting that duty to disclose under article 39.14 is broader than requirements under *Brady*).

At the hearing, the State explained that the existence of the USB drive and a summary of the surveillance footage reviewed around the time of the murder were mentioned in a police report from the night of the offense that had been disclosed in discovery, and as noted by the trial court, the police began investigating the case three years before trial. Further, the State related that Officer Campbell attempted to download all the surveillance footage onto the electronic system used by the San Marcos Police Department, that most of the files were downloaded to that site, and that the entirety of the files was copied onto the USB drive that was submitted into evidence and included in the list of evidence in the custody of the police. Next, the State mentioned that it notified Jones that it had moved the drive to the prosecutor's office and that he had not tried to look at the drive.

In light of the preceding, the trial court could have reasonably concluded that the existence of the drive and a summary of its contents had been disclosed to Jones timely, that he

11

had been informed of the existence and nature of the surveillance footage, that he had been given the opportunity to inspect the contents of the drive in advance of trial, and that he should have anticipated that the State would seek to have the contents of the drive introduced into evidence. *See* Tex. Code Crim. Proc. art. 39.14; *Amoles v. State*, No. 05-21-00556-CR, 2022 WL 3572691, at \*10 (Tex. App.—Dallas Aug. 19, 2022, no pet.) (mem. op., not designated for publication) (concluding that defendant failed to demonstrate requisite harm where record shows defense was aware of information at issue before filing of motion to dismiss); *see also State v. Garcia*, Nos. 13-21-00404—00405-CR, 2022 WL 3452413, at \*5 (Tex. App.—Corpus Christi-Edinburg Aug. 18, 2022, no pet.) (mem. op., not designated for publication) (explaining that article 39.14 requires State to provide defendant with open file of everything in State's possession).

Instead, the trial court elected to exclude the evidence on the drive, which is the "sanction that is generally accepted as the remedy for violations of article 39.14." *In re State*, 605 S.W.3d 721, 726, 727 (Tex. App.—Houston [1st Dist.] 2020, orig. proceeding); *see also State v. Heath*, 642 S.W.3d 591, 597 (Tex. App.—Waco 2022, pet. granted) (determining that trial court did not abuse its discretion by excluding 911 call not previously produced when State was set for trial without evidence). To further aid Jones and to facilitate the trial given the long delay leading up to it, the trial court elected to take the additional step of appointing another attorney to help Jones's primary attorney go through the contents of the drive and determine if there was any evidence on the drive that could help the defense. Although Jones contends that this additional remedy was ineffectual by postulating that the second attorney was unable to perform as good a review of the evidence as the primary attorney would have done, Jones does not identify how he was actually prejudiced by the trial court's ruling or what additional material or exculpatory evidence the primary attorney would have been able to discover had he been

12

given additional time. *Cf. Pitman v. State*, 372 S.W.3d 261, 268-69 (Tex. App.—Fort Worth 2012, pet. ref'd) (concluding that trial court did not err by denying motion for new trial where defendant failed to identify what undisclosed evidence was exculpatory or material). In fact, Jones concedes that he has no idea if any of the files would have been beneficial to him and that, accordingly, this Court could not "conduct a harmful error analysis" here.

On this record and considering the mitigating measures adopted by the trial court, even if the issue had been preserved, we would be unable to conclude that the trial court abused its discretion by denying Jones's motion for continuance. Accordingly, we overrule his first issue on appeal.

**Officers' Testimony About Surveillance Footage**

In his second issue on appeal, Jones contends that the trial court erred by overruling his objection to the testimony of Officer Campbell who testified about the contents of some of the surveillance footage from The Pointe. When presenting this argument, Jones again urges that the State violated the requirements of article 39.14 and *Brady* by failing to disclose the USB drive and that the trial court's decision to appoint an additional attorney did not cure the injury. Next, Jones argues that the trial court then improperly allowed Officers Campbell and Tankersley to testify about the surveillance footage showing the Nissan Rogue entering The Pointe complex because, according to him, that contravened trial court's prior ruling excluding the surveillance footage and because he did not have sufficient notice that the evidence would be allowed in through the officers' testimony.

In the previous issue, we addressed Jones's arguments regarding article 39.14, *Brady*, and regarding the appointment of an additional attorney. Turning to the testimony of the

officers, we review a trial court's decision to admit testimony from witnesses under an abuse-of-discretion standard even if the State did not comply with discovery requirements. *See Hall v. State*, 283 S.W.3d 137, 164-65 (Tex. App.—Austin 2009, pet. ref'd). Additionally, to preserve error in admitting evidence, "a party must object each time the inadmissible evidence is offered or obtain a running objection. An error [if any] in the admission of evidence is cured when the same evidence comes in elsewhere without objection." *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) (quoting *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003)). This rule applies whether the same evidence was admitted "without objection . . . before or after the complained-of ruling." *Davis v. State*, 614 S.W.3d 223, 229 (Tex. App.—Texarkana 2020, no pet.) (quoting *Lane*, 151 S.W.3d at 193).

During Officer Campbell's testimony, Jones objected after the officer testified that he went to The Pointe to look for surveillance videos. In a conference outside the presence of the jury, Jones argued that Officer Campbell would only be testifying about footage that had already been excluded by the trial court and that the State was attempting to get around that ruling. In response, the State explained that Officer Campbell's report explained that he "review[ed] the video" and described the content of the footage, and the State read from the portions of the report describing the Nissan Rogue entering the complex and describing the driver. Further, the State noted that the report had been disclosed when it gave Jones the "initial discovery in this case" and argued that Jones was aware that Officer Campbell could testify regarding his observations. After considering the parties' arguments, the trial court denied the objection and allowed Officer Campbell to testify about the contents of the footage that he reviewed. Following the trial court's ruling, Officer Campbell testified that he reviewed surveillance footage from The Pointe and observed the Nissan Rogue entering the complex at

6:49 p.m., no one other than the driver was in the vehicle, and that the driver had tattoos on his arm.

In light of the preceding, including the contents of Officer Campbell's report that had been disclosed in advance of trial, and given that the trial court's prior ruling regarding the USB drive excluded only the contents of the drive and that the State specifically mentioned during the hearing on the motion for continuance that it planned to call Officer Campbell to discuss his viewing of the footage, we cannot conclude that the trial court abused its discretion by allowing Officer Campbell to testify. *See Hall*, 283 S.W.3d at 164-65; *see also Hines v. State*, No. 14-15-00325-CR, 2016 WL 2935636, at *3 (Tex. App.—Houston [14th Dist.] May 17, 2016, no pet.) (mem. op., not designated for publication) (overruling ineffective-assistance claim asserting that trial attorney should have objected to store manager testifying about content of surveillance footage). In any event, as noted by Jones, Officer Tankersley provided similar testimony by stating that the Nissan Rogue arrived at The Pointe at 6:49 p.m., that surveillance footage from The Pointe showed the Nissan Rogue driving into the complex, and that the driver was an African American man in a yellow shirt who matched the description of the shooter. No objection was made to this evidence. Accordingly, any error from the admission of Officer Campbell's testimony was cured by the admission of the same evidence without objection. *Lane*, 151 S.W.3d at 193.

For these reasons, we overrule Jones's second issue on appeal.

## CONCLUSION

Having overruled both of Jones's issues on appeal, we affirm the trial court's judgment of conviction.

15

_____

Thomas J. Baker, Justice

Before Justices Baker, Triana, and Smith

Affirmed

Filed:   December 15, 2023

Do Not Publish