

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| PEDRO ENRIQUE FELIX, | § | No. 08-23-00136-CR |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | 120th Judicial District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20200D02709) |
| | § | |

**MEMORANDUM OPINION**

A jury found Appellant Pedro Enrique Felix guilty of one count of sexual assault and sentenced him to life in prison after finding that he had previously been convicted of two felony offenses. Appellant raises three issues on appeal, contending: (1) the State failed to present legally sufficient evidence to establish that the assault was non-consensual; (2) the trial court erred in denying his motion for a mistrial based on the State's failure to timely disclose evidence; and (3) the trial court failed to sequester the jury after it began deliberations. We do not condone the State's failure to timely disclose evidence. However, we find no evidence in the record to suggest Appellant was harmed by that failure. The trial court attempted to sequester the jury, but had

1

problems doing so. There is no evidence to suggest Appellant was harmed by the failure to sequester. Finding sufficient evidence to support the jury's verdict, we affirm the trial court's judgment of conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The events of March 17-18, 2018

On the evening of March 17, 2018, the complainant, Juan Ulibarri, who was 21 years old and living in Las Cruces at the time, traveled to El Paso with his then-boyfriend, Gabriel Gamboa, and a female friend identified as "Julia." Ulibarri became "very intoxicated" while at Tricky Falls, a venue in downtown El Paso, and was ejected from the venue at approximately 11:00 p.m. Although the details of what occurred next are less than clear, Gamboa recalled that he went outside to speak with Ulibarri, but after having an argument, Ulibarri walked away and eventually became lost in the downtown area. Gamboa and Ulibarri spoke by cell phone until approximately 4:00 a.m., when Gamboa's phone ran out of power. At some point, Ulibarri lost his cell phone and car keys. Gamboa recalled that he and Julia searched for Ulibarri, but after they were unable to locate him, they returned to Las Cruces. Gamboa received a call from a security officer at a downtown museum, later identified as the El Paso Museum of Art, saying he had found Ulibarri's cell phone and keys.

Ulibarri testified that his memory of what occurred after he left the venue was blurry due to his intoxicated state, acknowledging he was "falling in and out of consciousness that night," and he only remembered "snippets" of what occurred as he was "passed out" the majority of the time. He did recall, however, that after becoming lost in the downtown area for an unknown period of time, he lost consciousness and woke up in the backseat of a vehicle being driven by an unknown

2

man with an unknown woman in the passenger seat. According to Ulibarri, the two were "smoking some kind of drug." Ulibarri recalled that he told the couple he wanted to go home but then lost consciousness again and woke up as they were taking him into a house he believed was in Horizon City. According to Ulibarri, once inside the house, he again told the couple he wanted to go home. However, Ulibarri recalled accepting the couple's offer to take what he thought was cocaine and "consumed it willingly," believing it would help him become more alert and aware of his surroundings.[1] But he recalled that he soon became "sleepy" and accepted the couple's offer to lay down in a bedroom in the back of the house.

Ulibarri recalled that he awoke early that morning to find his pants off and the man "on top" and "behind" him, "trying to put his penis inside of [him]." According to Ulibarri, the man "grabbed [Ulibarri's] head and forced his penis inside of [Ulibarri's] mouth and then turned [him] back around and penetrated" him anally. Ulibarri speculated that the man put his penis in his mouth to lubricate it. He acknowledged that he did not tell the man to stop and did not attempt to physically resist him. However, Ulibarri, who was smaller than the man, explained he did not fight back because he "froze," did not "know what to do," and "was scared of being hurt" if he fought back.

After the man left the room, Ulibarri put his clothes back on and heard the man and woman talking in the other room. He asked the woman for a ride, and she took him to a convenience store that he believed was in Horizon City where she dropped him off.[2] Ulibarri entered the store and

---

[1] It is unclear from Ulibarri's testimony if he also consumed cocaine while in the vehicle with the couple.

[2] Ulibarri testified that he found a cell phone on the bed that he took with him and later gave to a police officer who arrived at the convenience store. However, it was later determined it was not a working phone.

asked the store clerk if he could use the phone to call police. The store clerk testified that Ulibarri appeared "upset" and informed him that he needed to contact police because he had been "raped." The clerk called 911 for him and recalled hearing Ulibarri inform police that he had been raped.[3]

When El Paso police officers arrived on the scene at 8:35 a.m. that morning, Ulibarri again reported that he had been raped. According to the officers, Ulibarri was crying and appeared "very distraught," and "extremely upset." According to Officer Jeannette Donahue, Ulibarri informed her that he had been at Tricky Falls the night before, that he had voluntarily accepted an offer for a ride from a man and woman, and that he had accepted drinks and cocaine from them. He further informed her that after passing out at their home, he awoke the next morning as the man was sexually assaulting him by penetrating his anus with his penis. However, Officer Donahue testified that Ulibarri did not report the oral penetration to her. But she did recall that he told her he did not fight back because he was "scared" and in a "state of shock."

As discussed in more detail below, after receiving information that a security guard at the art museum had found Ulibarri's cell phone and keys at a bench near the museum, Officer Donahue drove Ulibarri to the museum to pick them up. She then drove him to Anthony, Texas, at the border of Texas and New Mexico, where Gamboa and Julia's grandmother met him.

Gamboa recalled that Ulibarri informed him that he had been raped, and he recalled that Ulibarri was crying and "seemed very broken" at the time. According to Gamboa, he later broke up with Ulibarri because he did not believe Ulibarri's claim that he had been raped, in part because

---

[3] The recording of the 911 call was not available at the time of trial, as it had been destroyed prior to trial pursuant to a "retention policy." The State, however, provided the defense with a summary of the 911 call. And Appellant does not complain about the State's failure to preserve the recording.

4

Ulibarri would not provide him with "any details" of the incident. However, Gamboa testified that he later changed his mind, and at the time of trial he believed Ulibarri had in fact been raped.

### B.  The SANE examination

Approximately 12 hours after the incident, Gamboa took Ulibarri to a hospital in El Paso, where Ulibarri underwent a SANE examination by a sexual assault nurse examiner. Ulibarri told the SANE nurse that he had been orally and anally penetrated. The nurse did not observe any signs of external injury to his anus or perineum, noting that her exam is limited to external findings.[4] However, she observed that Ulibarri had scratches on his right knee, lower and upper back, right back thigh, and arms, as well as a bruise on his left shoulder. She did not recall if the injuries had scabbed over but stated that she would have included any such findings in her report if she had observed them. The nurse took a blood sample from Ulibarri and obtained swabs of Ulibarri's mouth and anus, and collected his clothing for later DNA testing, including his shirt, tank top and underwear.

### C.  Appellant's arrest and indictment

After receiving a lead from an undisclosed source, Appellant was taken into custody for questioning. During his interview, which was played for the jury, Appellant recalled that he often took Xanax in 2018 (the year of the alleged assault) and that he would sometimes drive around the El Paso area with a woman to give individuals a ride home. However, he did not recall picking anybody up in the downtown area during that time. Appellant further denied that he was "gay" and denied engaging in homosexual activities. Pursuant to a search warrant, buccal swabs were taken

---

[4] Gamboa testified at trial that on the way to the El Paso hospital, he pulled into a convenience store parking lot and checked Ulibarri's "area," which appeared to be "red" and "torn." However, Ulibarri refused to allow the nurse to examine his penis or scrotum.

from Appellant's mouth, which were later linked to the DNA found in the anal swabs taken from Ulibarri as well as the swabs from Ulibarri's underwear.

In January 2020, Appellant was indicted on one count of sexual assault. The indictment alleged that he had "intentionally or knowingly cause[d] the penetration of the anus of Juan Ulibarri by means of the defendant's sexual organ, without the consent of Juan Ulibarri." It further alleged that he had previously been convicted in El Paso County of "the felony offense of Assault Cases [sic] Bodily Injury/Household Member" in April 2007, and of aggravated robbery that same month.

### D. The jury's verdict

During closing arguments, defense counsel argued, *inter alia*, that the State had not met its burden of proving beyond a reasonable doubt that Ulibarri did not consent to the sexual encounter, contending Ulibarri's testimony on the issue of consent was riddled with inconsistencies, his memory was blurred due to his intoxicated state, and there was no evidence of a struggle.[5] The jury, however, returned its verdict finding Appellant guilty of sexual assault as alleged in the indictment. The jury was polled, and all of the jurors stated that this was their verdict. Following the punishment phase of the trial, the jury found the allegations pertaining to Appellant's prior convictions true and sentenced Appellant to life in prison. Appellant did not file a motion for new trial.

---

[5] During closing arguments, defense counsel also argued there was insufficient evidence to link Appellant to the offense. But on appeal, Appellant no longer makes this argument and instead focuses solely on the issue of consent.

## SUFFICIENCY OF THE EVIDENCE

In his first issue, Appellant contends the evidence was insufficient to establish beyond a reasonable doubt that Ulibarri did not consent to the encounter. We disagree.

### A. Standard of review

Under the Due Process Clause of the U.S. Constitution, the State is required to prove every element of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). In reviewing the sufficiency of the evidence where the State has the burden of proof beyond a reasonable doubt, we apply the legal sufficiency standard articulated in *Jackson. Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010); *Rogers v. State*, No. 08-22-00207-CR, 2023 WL 3736730, at *3 (Tex. App.—El Paso May 31, 2023, no pet.) (mem. op., not designated for publication). We must view all the evidence in the light most favorable to the verdict to determine whether any rational juror could have found the essential elements of the offense beyond a reasonable doubt. *Salinas v. State*, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005).

"This standard gives full play to the responsibility of the factfinder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018) (quoting *Jackson*, 443 U.S. at 319). "The jury acts as the sole judge of the credibility of the witnesses and may choose to believe all, some, or none of the testimony presented." *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023) (citing *Sharp v. State*, 707 S.W .2d 611, 614 (Tex. Crim. App. 1986)). As such, we may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact-finder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We must presume the fact-finder resolved any conflicting inferences in favor of the verdict, and we defer to

those determinations. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014) (citing *Jackson*, 443 U.S. at 319). Our only task is to determine whether, based on the evidence and reasonable inferences drawn therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Isassi*, 330 S.W.3d at 638.

"Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Further, "[e]ach fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction." *Nisbett*, 552 S.W.3d at 262. "Because evidence must be considered cumulatively, appellate courts are not permitted to use a divide and conquer strategy for evaluating the sufficiency of the evidence." *Id.*

## B. Analysis

A person commits the offense of sexual assault if he intentionally or knowingly causes the penetration of the anus or sexual organ of another person by any means without the other person's consent. Tex. Penal Code Ann. § 22.011(a)(1)(A). On appeal, Appellant acknowledges that the State met its burden of establishing that he intentionally or knowingly caused the penetration of Ulibarri's anus by his sexual organ, but he contends the State failed in its burden of establishing that the penetration was without Ulibarri's consent. The Penal Code provides a variety of circumstances in which a jury may find that a sexual encounter is without the consent of the other person. Tex. Penal Code Ann. § 22.011(b).[6] Here, the trial court instructed the jury on three such

---

[6] The Penal Code provides that a sexual assault is without the consent of the other person if, among other things: "(1)

instances: (1) the other person has not consented to the encounter and the actor knows the other person is unconscious or physically unable to resist; (2) the other person has not consented and the actor knows the other person is unaware that the sexual assault is occurring; or (3) the actor has intentionally impaired the other person's power to appraise or control the other person's conduct by administering any substance without the other person's knowledge. *Id*. § 22.011(b)(3), (5), (6). Because we find there was sufficient evidence to support the first circumstance, we need not address the other two.

As a preliminary matter, we agree with Appellant that the record does not support an inference that Ulibarri was unconscious or asleep at the time of the indicted act, i.e., at the time the anal penetration occurred, as Ulibarri testified that he woke up shortly before the act occurred.[7]

---

the actor compels the other person to submit or participate by the use of physical force, violence, or coercion; (2) the actor compels the other person to submit or participate by threatening to use force or violence against the other person or to cause harm to the other person, and the other person believes that the actor has the present ability to execute the threat; (3) the other person has not consented and the actor knows the other person is unconscious or physically unable to resist; (4) the actor knows that as a result of mental disease or defect the other person is at the time of the sexual assault incapable either of appraising the nature of the act or of resisting it; (5) the other person has not consented and the actor knows the other person is unaware that the sexual assault is occurring; (6) the actor has intentionally impaired the other person's power to appraise or control the other person's conduct by administering any substance without the other person's knowledge; [or] (7) the actor compels the other person to submit or participate by threatening to use force or violence against any person, and the other person believes that the actor has the ability to execute the threat." Tex. Penal. Code Ann. § 22.011(b)(1–7).

[7] Appellant correctly points out that, in contrast, the State has only cited cases in which the victim was either unconscious or asleep (or feigning sleep) at the time the indicted act occurred, thereby clearly supporting an inference that the defendant knew the complainant was physically unable to resist. *See, e.g.*, *Hughes v. State*, 194 S.W.3d 649, 654 (Tex. App.—Tyler 2006, no pet.) (finding legally sufficient evidence supported jury's finding that the victim did not consent to sexual conduct where the victim testified that the defendant began the sexual assault while she was sleeping and she awoke after the defendant was in the process of engaging in sexual conduct, reasoning that "the sexual assault was completed before the victim was conscious or physically able to resist"); *In re D.G*, No. 03-12-00455-CV, 2014 WL 3732930, at *2 (Tex. App.—Austin July 23, 2014, no pet.) (mem. op., not designated for publication) (finding sufficient evidence supported trial court's finding that juvenile committed sexual assault where complainant testified that the juvenile removed her clothing while she was sleeping and that when she woke up, he was already on top of her and had already begun engaging in sexual conduct); *Viera v. State*, No. 08-10-00332-CR, 2012 WL 4101904, at *4 (Tex. App.—El Paso Sept. 19, 2012, pet. ref'd) (not designated for publication) (finding legally sufficient evidence supported jury's finding that the victim did not consent to sexual conduct where the victim testified that she was "very intoxicated," fell asleep, and woke up to the defendant on top of her with his penis inside her vagina).

As well, Appellant correctly points out that Ulibarri testified that despite being awake, he did not physically resist, did not tell Appellant to stop, and did not otherwise communicate to Appellant that he did not consent to the penetration. However, as explained below, these factors, standing alone, did not prevent a rational jury from concluding that the act was nonconsensual.

First, under current law, the State is not required to present evidence that the victim of a sexual assault physically or verbally resisted the defendant's actions; instead, "the emphasis is now on the actor's compulsion rather than the victim's resistance." *See Hernandez v. State*, 804 S.W.2d 168, 170 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd) (citing *Bannach v. State*, 704 S.W.2d 331, 332–33 (Tex. App.—Corpus Christi–Edinburg 1986, no pet.); *see also State for B.H. v. J.D.*, No. 01-20-00316-CV, 2022 WL 320056, at *8 (Tex. App.—Houston [1st Dist.] Feb. 3, 2022, no pet.) (mem. op., not designated for publication) (recognizing that a victim of a sexual assault "is not required to resist, and it may be wise not to do so.") (citing *Jimenez v. State*, 727 S.W.2d 789, 792 (Tex. App.—Houston [1st Dist.] 1987, pet. ref'd)).

Second, under subsection (b)(3), a jury may infer that a complainant did not consent to the defendant's conduct when he or she is "physically unable to resist." As the Texas Court of Criminal Appeals has recognized, the concept of being "physically unable to resist" under the Penal Code has a broader meaning than merely being asleep or unconscious during a sexual assault. In *Elliott v. State*, the Court held that "where assent in fact has not been given, and the actor knows that the victim's physical impairment is such that resistance is not reasonably to be expected, sexual intercourse is 'without consent' under the sexual assault statute." 858 S.W.2d 478, 485 (Tex. Crim. App. 1993) (en banc). Thus, the State is not required to prove that a victim was unconscious or "unable to move" in order to establish that he or she was "physically unable to resist." *Elliott*, 858

10

S.W.2d at 485; *see also Alexander v. State*, No. 08-20-00051-CR, 2022 WL 3010075, at \*9 (Tex. App.—El Paso July 29, 2022, no pet.) (not designated for publication) (recognizing same). Instead, a jury may reasonably infer, based on the totality of the circumstances, that the defendant was aware the complainant was unable to physically resist where his or her "physical condition was such that any resistance was unlikely." *See Alexander*, 2022 WL 3010075 at \*12; *Pierce v. State*, No. 05-12-01211-CR, 2013 WL 6196275, at \*3–5 (Tex. App.—Dallas Nov. 25, 2013, no pet.) (mem. op., not designated for publication); *Salazar v. State*, No. 05-05-01455-CR, 2006 WL 3291049, at \*3 (Tex. App.—Dallas Nov. 14, 2006, pet. ref'd) (not designated for publication); *see generally Brown v. State*, 576 S.W.2d 820, 823 (Tex. Crim. App. [Panel Op.] 1978) (finding lack of consent under the "totality of the circumstances" presented in the record).

Here, after carefully reviewing the record, we conclude there was sufficient evidence from which the jury could have reasonably concluded that Appellant was aware Ulibarri was unlikely to resist. As set forth above, Ulibarri testified that he was already highly intoxicated when Appellant picked him up and that he passed out in Appellant's car on the way to his home. And he further testified that once there, Appellant provided him with drugs, after which he became sleepy and accepted Appellant's offer to sleep in a back bedroom in the house. Ulibarri testified that he awoke to find his clothes off and Appellant on top of him, attempting to force his penis inside him. Although Ulibarri admittedly did not physically resist Appellant, he testified that he did not do because he was "in shock" and in fear for his safety, particularly given the fact that Appellant was much larger than he was. We find these facts sufficient to support an inference that Appellant was

11

aware Ulibarri's physical impairment was such that any resistance was "unlikely," and consequently, Ulibarri did not consent to Appellant's assault, despite his lack of protest.[8]

Finally, the Texas Penal Code provides that a victim's lack of consent may be proven solely by the victim's testimony if he informed any person of the offense within one year of the offense, even if such testimony is uncorroborated. Tex. Code Crim. Proc. Ann. art. 38.07(a) (providing that a conviction for sexual assault under Penal Code § 22.011 "is supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person, other than the defendant, of the alleged offense within one year after the date on which the offense is alleged to have occurred"); *see also Carbajal v. State*, 659 S.W.3d 164, 181 (Tex. App.—El Paso 2022, pet. ref'd) (where complainant "made an outcry regarding this incident within hours . . . her uncorroborated testimony is sufficient to support [the appellant's] conviction" for sexual assault) (citing *Calais v. State*, 624 S.W.2d 811, 813 (Tex. App.—Houston [14th Dist.] 1981, no pet.); *Phillips v. State*, 362 S.W.3d 606, 611 (Tex. Crim. App. 2011), *overruled on other grounds by Ex parte Heilman*, 456 S.W.3d 159 (Tex. Crim. App. 2015) (recognizing that revisions to Article 38.07 "authorized conviction of certain sexual offenses on the victim's testimony alone, although

---

[8] *See Salazar v. State*, No. 05-05-01455-CR, 2006 WL 3291049, at *3 (Tex. App.—Dallas Nov. 14, 2006, pet. ref'd) (not designated for publication) (finding sufficient evidence to support an inference that complainant was unlikely to resist when defendant knew complainant was "very drunk," offered to "take care" of complainant, and then took off complainant's clothes and began to perform oral sex on him in an "aggressive" manner); *see also Alexander v. State*, No. 08-20-00051-CR, 2022 WL 3010075, at *10 (Tex. App.—El Paso July 29, 2022, no pet.) (not designated for publication) (holding that a rational jury "could have concluded beyond a reasonable doubt that [the defendant] knew [the complainant's] physical impairment was such that resistance was not reasonably to be expected," where defendant knew the complainant was highly intoxicated; therefore, the fact that she did not resist the defendant's sexual assault, and instead admittedly "just laid there like a dead fish," did not vitiate her lack of consent); *Pierce v. State*, No. 05-12-01211-CR, 2013 WL 6196275, at *2, 4–5 (Tex. App.—Dallas Nov. 25, 2013, no pet.) (mem. op., not designated for publication) (holding that jury could have found that defendant knew complainant was unlikely to physically resist, where complainant testified that he awoke after several hours of drinking at a holiday work party to find the defendant, a male coworker, on top of him, licking him "around [his] scrotum and penis," but did not protest when the defendant placed his penis in his mouth, despite being aware of what was occurring, where he had just been "aroused from his sleep; his eyes were closed, and he was not alert").

12

corroborating evidence had previously been required"). Here, Ulibarri immediately reported the encounter to police at his first possible opportunity after he was able to leave Appellant's house and the same day reported to his friends and a SANE nurse that the encounter had not been consensual and that he had been raped.

Accordingly, we find legally sufficient evidence in the record to support the jury's verdict. Appellant's first issue is overruled.

## DENIAL OF THE MOTION FOR MISTRIAL

In his second issue, Appellant contends the trial court erred in denying his motion for mistrial, which was based on the State's admitted failure to disclose evidence in its possession until the last day of trial. Although we do not in any way condone the State's conduct, the record does not establish Appellant was harmed by the violation such that reversal of his conviction would be required.

### A. Discovery issues that arose at trial

Two separate discovery issues arose during Appellant's trial.

#### (1) Ulibarri's criminal history

On March 27, 2023—the first day of trial—defense counsel informed the trial court of her request for Ulibarri's criminal history in October 2020 pursuant to Texas Code of Criminal Procedure Article 39.14 (the Michael Morton Act), but the State had just informed her Ulibarri had a more extensive criminal background than it had previously disclosed. Those additional charges included a "DWI and a battery charge" in New Mexico, neither of which appeared in the original criminal history report the State had previously received. The State, however, explained that Ulibarri had informed the prosecutorial team the weekend before trial of those two charges

13

and that due to reporting issues from New Mexico, those charges did not appear in the initial report. Defense counsel moved to strike Ulibarri's testimony on that basis, but the trial court denied the request and allowed Ulibarri to testify on direct examination. However, the trial court granted defense counsel's motion for a continuance to allow her to further determine the full extent of Ulibarri's criminal history and whether it could be used during her cross-examination. The trial court then allowed the State to conduct its direct examination of Ulibarri before excusing the jury for the day.

The next day, defense counsel informed the trial court that the State had just disclosed additional information indicating Ulibarri had previously pled guilty to felony possession of a controlled substance and had been placed on probation. The State responded that it did not have that information in its files when it made its disclosures to defense counsel, and it had been acting in "good faith" at the time. The trial court found that there was no violation of the Michael Morton Act because Ulibarri's criminal history information had not been in the State's file at the time the State responded to Appellant's request for disclosure. However, the court granted defense counsel's request for a continuance (ten days) to investigate the criminal history of Ulibarri and the State's other witnesses to determine whether any of their criminal histories could be used for impeachment purposes. The court then excused the jurors and recessed the trial until April 10, 2023.[9]

---

[9] At an April 3rd status hearing, the trial court, with the agreement of the parties, seated an alternate juror, as one of the original jurors had informed the court that he might not be available when the trial resumed due to an upcoming surgery.

14

When the trial resumed on April 10, 2023, defense counsel asked the court to instruct the jury that the trial had been continued due to the State's failure to comply with the statutory disclosure requirements, but the trial court denied the request. Defense counsel then requested a mistrial based on the lack of an instruction, but the trial court denied that request as well. The case continued with defense counsel cross-examining Ulibarri and the State presenting its other witnesses. Defense counsel did not use any of the criminal history information it received to impeach Ulibarri.

### (2) The dispatch log

A second discovery issue arose later the same day while El Paso Police Officer Jeannette Donahue was testifying regarding what occurred after she was dispatched to the convenience store in response to Ulibarri's 911 call the morning of March 18, 2020. Officer Donahue testified that she had received information that a security officer found Ulibarri's phone and car keys at a bench near the El Paso Museum of Art, and she drove Ulibarri to retrieve them. However, on cross-examination, she could not recall the exact location where she took Ulibarri, or who had provided her with the information regarding where the items were located. And she further testified that she did not include any of that information in her incident report.

On redirect, the State asked if reviewing her dispatch log would refresh her recollection regarding her dispatch locations that day, but defense counsel objected that the State had not provided a copy of the dispatch log prior to trial.[10] The State initially expressed its belief that the information had been in its portal and was therefore available to defense counsel, but defense

---

[10] The log was described as a "chronology" of events that occurred, or a "call sheet." According to Officer Donahue, she is required to log in "any interaction, every call, any stop, anything that we do during our duty day."

counsel stated that she had never seen it. The trial court indicated that it had no way of knowing whether the document had been in the portal but nevertheless ruled that the State could not use it to cross-examine the officer. Defense counsel then asked for a mistrial due to the State's failure to disclose the information prior to trial and subsequently asked for additional time to "look at that issue." The trial court noted that it had already granted a two-week extension due to the first discovery issue and denied the request for a continuance as well as defense counsel's renewed motion for a mistrial, indicating the court was "moving on at this time."

Later in the day, the prosecutor informed the court that his paralegal reviewed the matter and learned that the log had not been uploaded into the portal. The prosecutor averred that the failure to upload the document was not intentional, and that, in any event, Appellant was not harmed by the failure to disclose the log, as (1) the State no longer intended to use it to refresh Officer Donahue's memory, and (2) the log did not contain any information "material" to the case. Defense counsel responded that Ulibarri's mother was listed on the dispatch log, along with her telephone number. Defense counsel argued that she was a potential witness in the case and pointed out that her information had not been disclosed elsewhere.[11]

The trial court, while recognizing the State's obligation to produce the document during discovery, found it significant that the State did not intentionally withhold the document. The court further found that the discovery violation was not prejudicial to Appellant's case because the State

---

[11] The State argued that defense counsel was aware of the mother's involvement in the case, as Ulibarri had testified during cross-examination that he had contacted the "mother" to provide her with directions to where he could be picked up in Anthony. However, the record reflects that Ulibarri testified that this exchange was with Julia's grandmother, who drove Gamboa to the location to pick up Ulibarri.

no longer intended to use the document to impeach Officer Donahue. Defense counsel then renewed her motion for a mistrial, which the trial court again denied.

## B. The parties' arguments on appeal

Appellant contends the trial court erred in denying his motion for a mistrial based on the State's failure to timely disclose Officer Donahue's dispatch log, and he was harmed by the failure. Although Appellant does not separately challenge the State's failure to grant his request for a mistrial based on the State's late disclosure of Ulibarri's criminal history, he argues that the cumulative effect of the State's discovery violations warrants reversing his conviction and granting a new trial.[12]

The State, while not disputing that it failed to timely disclose the dispatch log, contends Appellant did not preserve error because he did not file a written sworn motion for a continuance to determine whether the log was material to the issues in his case. The State further argues that even if Appellant did preserve error, the record does not demonstrate that he was harmed by the denial of his motion for a mistrial. We agree with the State on the harm determination; therefore, we need not address whether Appellant preserved error.

## C. Standard of review

Because a mistrial halts the trial proceedings, it should only be granted "when error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) (citing *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)); *see also Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)

---

[12] Appellant concedes that the two-week continuance granted by the trial court served to mitigate any purported harm caused by the State's failure to timely disclose Ulibarri's criminal history information.

(recognizing that "[a] mistrial is the trial court's remedy for improper conduct that is so prejudicial that expenditure of further time and expense would be wasteful and futile") (internal quotation marks omitted). Thus, it should only be used in "extreme circumstances" when an error occurs at trial that is "highly prejudicial and incurable." *Ocon*, 284 S.W.3d at 884 (citing *Hawkins*, 135 S.W.3d at 77); *see also Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). Whether an error requires a mistrial must be determined by the particular facts of the case. *Ocon*, 284 S.W.3d at 884.

An appellate court reviews a trial court's denial of a motion for a mistrial under an abuse of discretion standard. *See Becerra v. State*, 685 S.W.3d 120, 127 (Tex. Crim. App. 2024) reh'g denied (Mar. 27, 2024) (citing *Hawkins*, 135 S.W.3d at 77). "Under the abuse of discretion standard, we do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable." *Id*. A trial court abuses its discretion only "when no reasonable view of the record" could support its ruling; therefore, we must uphold the trial court's ruling on a motion for mistrial if it was within the "zone of reasonable disagreement." *Webb*, 232 S.W.3d at 112 (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)).

**D. Applicable law: *Brady* and the Michael Morton Act**

There are two bodies of law governing discovery in criminal cases. First, as the United States Supreme Court held in the seminal case of *Brady v. Maryland*, the Due Process Clause requires the State to disclose exculpatory or impeachment evidence that is material to guilt or punishment. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also United States v. Bagley*, 473 U.S. 667, 676 (1985). A *Brady* violation occurs whenever the state suppresses, either willfully or even inadvertently, evidence favorable to a defendant. *Brady*, 373 U.S. at 87; *Harm v. State*, 183

18

S.W.3d 403, 406 (Tex. Crim. App. 2006) (en banc). *Brady* articulates three requirements a defendant must meet to establish reversible error: (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to him (whether exculpatory or useful for impeachment purposes); and (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011), (citing *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002)). Thus, "*Brady* does not require the prosecution to disclose every piece of evidence in its possession nor does it require the prosecution to provide all useful information or anticipate possible defenses and provide information supporting those defenses." *Kekuewa v. State*, No. 08-04-00378-CR, 2007 WL 947294, at *3 (Tex. App.—El Paso Mar. 29, 2007, pet. ref'd) (not designated for publication) (citing *Michaelwicz v. State*, 186 S.W.3d 601, 616 (Tex. App.—Austin 2006, pet. ref'd)).

The Michael Morton Act, found in Texas Code of Criminal Procedure Article 39.14, provides additional protections beyond *Brady* to criminal defendants in Texas. *See* Tex. Code Crim. Proc. art. 39.14. It requires the State to disclose all documents or other objects and tangible things "not otherwise privileged that constitute or contain evidence material to any matter involved in the action and that are in the possession, custody, or control of the state or any person under contract with the state." Tex. Code Crim. Pro. Ann. art. 39.14 (a). Recently, the Texas Court of Criminal Appeals held that "the word 'material' as it appears in the statute means 'having a logical connection to a consequential fact' and is synonymous with 'relevant' in light of the context in which it is used in the statute." *Watkins v. State*, 619 S.W.3d 265, 290 (Tex. Crim. App. 2021).

### E.  A discovery violation occurred

As set forth above, the State does not contest and we agree with Appellant's claim that the withholding of the dispatch log constituted a discovery violation under the Michael Morton Act.[13] The log was "material" to Appellant's case under the *Watkins* standard, as it was directly connected to Officer Donahue's investigation of the case and events that took place after Ulibarri reported the assault. *See Watkins*, 619 S.W.3d at 290. However, the parties disagree on whether Appellant was entitled to a mistrial due to the violation.

### F.  The record before us does not support a finding of harm

Courts appear to take two different approaches in determining whether a trial court abused its discretion by a mistrial based on the State's discovery violation. The divergent approaches were laid bare in our sister court's opinion in *Hallman v. State*, 647 S.W.3d 805, 815–16 (Tex. App.— Fort Worth 2022, pet. granted) in which the majority applied the three *Mosley* factors in determining whether the trial court erred in denying a mistrial based on the State's discovery violation. *See Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (en banc). Both the concurring and dissenting judges in that case, however, based their determination on a traditional harm analysis under Texas Rule of Appellate Procedure Rule 44.2(b), which provides that any nonconstitutional "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Tex. R. App. P. 44.2 (b); *Hallman*, 647 S.W.3d at 845 (Womack, J. dissenting); *Id*. at 855 (Walker, J., concurring). Because the Texas Court of Criminal Appeals has not yet opined on which approach is correct, we analyze both. Under each analysis, we reach the same conclusion that Appellant has not established reversable error.

---

[13]  The parties agree that the log was encompassed within defense counsel's request for disclosure.

### (1) The *Mosley* analysis

The three *Mosley* factors are: (1) the severity of the misconduct, (2) measures adopted to cure the misconduct, and (3) the certainty of conviction absent the misconduct. *Hallman*, 647 S.W. 3d at 825 (citing *Hawkins*, 135 S.W.3d at 75–76)). Here, although the State contends its failure to produce the discovery log was unintentional, we would have difficulty concluding the failure was less than severe, given the log's materiality to the case, and given the purpose of the Michael Morton Act to ensure that the State discloses all material evidence to the defendant in a timely manner.[14] Additionally, the trial court took no steps to mitigate the harm from the State's untimely disclosure of the log, such as by granting a continuance to allow defense counsel to investigate whether the log did in fact contain any evidence that could have benefitted Appellant's case.[15] This leads to the last step in the analysis—the question of "the certainty of Appellant's conviction absent the misconduct." Based on the record before us, we cannot answer this question without engaging in speculation, which we are prohibited from doing.

---

[14] The Michael Morton Act was adopted to avoid a repeat of the circumstances that led to Michael Morton's wrongful conviction by requiring the State to turn over all material evidence in its possession upon the defendant's timely request. *See Murray v. State*, No. 08-16-00185-CR, 2018 WL 1663882, at *4 (Tex. App.—El Paso Apr. 6, 2018, pet. ref'd) (not designated for publication) (recognizing that "[t]he Michael Morton Act changed Texas law related to discovery in criminal cases in order to prevent wrongful convictions by ensuring defendants have access to the evidence in the State's possession so they may prepare a defense").

[15] As set forth above, defense counsel initially requested a continuance to investigate the issue of whether the State had produced the dispatch log during pretrial discovery, but the trial court denied the request, summarily stating that it was "moving on" with the trial and indicating it was not inclined to grant any additional continuances given the earlier two-week continuance. Although defense counsel did not renew her request for a continuance after it came to light that the State had failed to timely produce the dispatch log, under these circumstances, defense counsel could have determined it was futile to renew her request. *See Hill v. State*, 90 S.W.3d 308, 316 (Tex. Crim. App. 2002) (en banc) (recognizing that "[t]he law does not requires a futile act"); *Ex parte Chandler*, 182 S.W.3d 350, 356 (Tex. Crim. App. 2005) (recognizing that a "reasonably competent counsel need not perform a useless or futile act").

The record does not contain a copy of the log itself, and our only knowledge of the log's contents comes from the descriptions the attorneys provided during their arguments to the trial court. The primary focus of defense counsel's argument in the trial court was on the fact that Ulibarri's mother was listed on the dispatch log, along with her telephone number, which made the mother a potential witness in the case.[16] Appellant speculates that Ulibarri may have had a conversation with his mother the morning of the assault, and argues that she may have been able to "shed light" on Ulibarri's credibility on the crucial issue of consent.

But as the State points out, there is simply nothing in the record to suggest what evidence, if any, the mother could have provided if defense counsel had contacted her. Because the log is not in the record, we do not know if Ulibarri was able to speak with his mother the morning of the offense or, if so, for how long. Nor do we know what, if anything, Ulibarri told his mother about the assault. While it is possible that he may have spoken with her and told her his encounter with Appellant was consensual, it is also possible that he told her it was nonconsensual, consistent with his report to Officer Donahue and others. Thus, as the State points out, the question of whether the State's discovery violation would have any impact on the jury's verdict is purely speculative on this record. *See Myres v. State*, 866 S.W.2d 673, 674 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd) (finding no harm where jury charge error "was as likely to have helped appellant as to have harmed him, or it may have had no effect at all").

---

[16] Appellant also argues for the first time on appeal that the dispatch log contained information regarding where Ulibarri's keys and cell phone were found, which could have provided defense counsel with investigative leads in that area. However, he does not elaborate on how this information would have assisted his case.

By analogy, in cases involving *Brady* violations, Texas courts have consistently held that a defendant may not rely on speculation in meeting the requirement that undisclosed evidence was "material" to his case, i.e., that the outcome of his case would have been different had the State timely disclosed the evidence. *See, e.g.*, *Frazier v. State*, No. 02-12-00539-CR, 2014 WL 3953790, at *2 (Tex. App.—Fort Worth Aug. 14, 2014, no pet.) (per curiam) (mem. op., not designated for publication) (trial court did not abuse its discretion in denying defendant's mistrial based on the state's failure to disclose a witness statement in a timely manner, where defendant only speculated regarding what might have occurred if the State had disclosed the statement earlier); [17] *Michaelwicz*, 186 S.W.3d at 615–16 (trial court did not abuse its discretion in denying defendant's motion for mistrial based on State's failure to disclose evidence, where defendant relied only on "speculation" in attempting to establish that the undisclosed information would have helped his case or otherwise affected the outcome of his trial); *see also Renteria v. State*, 206 S.W.3d 689, 702–03 (Tex. Crim. App. 2006) (defendant was required to come forward with more than "speculation" to justify reversal of the trial court's failure to grant a continuance to allow defendant to investigate the materiality of newly disclosed evidence); *Roberts v. State*, No. 08-19-00029-CR,

---

[17] The court in *Frazier* relied on the following cases: *Pitman v. State*, 372 S.W.3d 261, 273 (Tex. App.—Fort Worth 2012, pet. ref'd) (holding that trial court did not abuse its discretion by denying defendant's motion for new trial where defendant did not establish a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different"); *Spruiell v. State*, Nos. 05–01–01414–CR, 05–01–01415–CR, 2003 WL 21508441, at *4 (Tex. App.—Dallas July 2, 2003, pet. ref'd) (not designated for publication) (holding that defendant did not establish that undisclosed statements were material to his case where he failed to explain how his case strategy would have changed if evidence had been disclosed sooner); *Pena v. State*, 353 S.W.3d 797, 812 (Tex. Crim. App. 2011) (stating that the mere possibility that undisclosed information might have affected the outcome of defendant's case does not establish materiality); *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").

2019 WL 7046756, at *7–8 (Tex. App.—El Paso Dec. 23, 2019, pet. ref'd) (not designated for publication) (recognizing same).

Appellant contends, however, that the very reason he is forced to speculate about whether the dispatch log would have assisted his case stems from the State's failure to timely disclose the log, pointing out that because the dispatch log was not divulged until the last day of trial, he was prevented from pursuing this investigative lead. Appellant contends that in effect, the State is arguing that defense counsel should be expected to do the impossible, i.e., prove what information could have been obtained from the log and what information the mother could have provided as a potential witness—when the inability to do so stems entirely from the State's own misconduct.[18]

To be sure, we do not condone the State's delay in producing the log. Yet, had Appellant believed it contained information helpful to his case, he could have filed a motion for new trial pursuant to Texas Code of Criminal Procedure Article 45A.201(a) and requested an evidentiary hearing to establish he was harmed by the State's failure to disclose the information.[19] *See Reyes v. State*, 849 S.W.2d 812, 816 (Tex. Crim. App. 1993) (en banc) (recognizing that a hearing on a motion for new trial is necessary when the matters raised in the motion are not determinable from the record); *King v. State*, 29 S.W.3d 556, 569 (Tex. Crim. App. 2000) (en banc) (discussing necessity of holding a hearing when a defendant presents a motion for new trial raising "matters not determinable from the record which could entitle him to relief"). As Appellant did not file a

---

[18] Appellant deftly refers to the State's argument as a "self-licking ice cream cone." According to Appellant, "the State is using the very deficiency it created by failing to turn over evidence as a shield, so the inevitable conclusion will always be 'no discovery, no problem.'"

[19] We also note the possibility of filing a post-conviction petition for a writ of habeas corpus to address the issue of whether he was harmed by the State's discovery violation. *See Diamond v. State*, 613 S.W.3d 536, 545–46 (Tex. Crim. App. 2020) (discussing the requirements for determining whether a discovery violation entitles a defendant to post-conviction relief).

motion for new trial or seek a post-judgment hearing on his claim that the discovery violation warranted a mistrial, we are without a sufficient record to reverse the trial court's judgment on that basis. *See Cordova-Lopez v. State*, 680 S.W.3d 5, 12–14 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd) (record did not support defendant's claim that he was harmed by trial court's denial of his motion for continuance, where defendant "did not file a motion for new trial or seek to obtain a post-judgment hearing to produce evidence regarding any actual harm he suffered during trial because of the denial," and his argument was based solely on "speculation").

### (2) Whether the discovery violation affected Appellant's substantial rights

For similar reasons, we conclude the record does not support a finding that Appellant was harmed by the State's discovery violation under the Rule 44.2(b) standard. Rule 44.2(b) provides that, aside from constitutional errors, "[a]ny other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Tex. R. App. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Thomas v. State*, 505 S.W.3d 916, 926 (Tex. Crim. App. 2016) (citing *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)). "If, after a review of the record as a whole, the appellate court can say that it 'has fair assurance that the error did not influence the jury, or had but a slight effect,' then the error is harmless." *Id.* (quoting *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002)).

Because the record before does not provide us with a basis for determining how the undisclosed evidence would have affected the jury's verdict, we cannot say that the State's discovery violation affected Appellant's substantial rights under Rule 44.2(b). Accordingly, we cannot reverse the trial court's judgment on this basis.

Appellant's second issue is overruled.

## FAILURE TO SEQUESTER THE JURORS

In his third issue, Appellant contends the trial court erred in failing to sequester the jurors overnight after they began their deliberations, and the error requires reversal. Although we express no opinion on whether the trial court erred in failing to sequester the jury under the unique circumstances of this case, the record does not reflect Appellant was harmed as a result.

### A. Background

The jury began deliberating on the last day of trial at 11:16 a.m. At 4:53 p.m., the jury sent the trial court judge a note stating: "A few of the jurors are still undecided and feel that they need to sleep on things overnight. We hope to reach a decision by tomorrow." In a 5:00 p.m. conference with the attorneys, the judge explained that her staff was having problems finding a hotel that could accommodate the jury for overnight sequestration. The judge indicated that her staff had found a hotel, but the "credit card that we use for the county was declined." Defense counsel requested overnight sequestration, and the State expressed a preference to allow the jury to go home for the night and to continue its deliberations the next morning. Another break in the proceedings ensued, and at 5:38 p.m., the judge came back on the record and reported that she had offered to use her personal credit card to pay for a hotel, but her bailiff had been on hold for 40 minutes with the only hotel they had found that could accommodate the jury. The judge then announced she did not believe it was "going to be practically possible to sequester the jury." Defense counsel again objected, asserting her sequestration request. Over defense counsel's objections, the judge brought the jurors back in, instructed them that she was discharging them for the night and, as explained

26

below, reminded them of her prior instructions that they were prohibited from discussing the case with anyone. The jurors came back the next morning and returned a guilty verdict.

### B. Applicable law

Texas Code of Criminal Procedure Article 35.23 gives a trial court the discretion to permit the jurors to separate in a felony case until the court has provided the jury charge. Tex. Code Crim. Pro. Ann. art. 35.23. However, after the charge is given, the Code provides that the "court on its own motion may and on the motion of either party shall, after having given its charge to the jury, order that the jury not be allowed to separate, after which the jury shall be kept together, and not permitted to separate except to the extent of housing female jurors separate and apart from male jurors, until a verdict has been rendered or the jury finally discharged." *Id.* Accordingly, when a party moves to sequester the jury, sequestration is mandatory, and it is error to deny the request. *Polk v. State*, 367 S.W.3d 449, 454 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (where appellant made a timely request, the trial court was required to sequester the jury); *Delgado v. State*, No. 08-05-00391-CR, 2008 WL 2402256, at *1 (Tex. App.—El Paso June 12, 2008, no pet.) (not designated for publication) (where appellant made a timely motion to sequester the jury after the charge was given, trial court erred in failing to grant the motion).

Nevertheless, it is well-established that any error in "failing to sequester a jury is a violation of a statute not a constitutional mandate" and is therefore governed by Texas Rule of Appellate Procedure Rule 44.2(b).[20] *See Delgado*, 2008 WL 2402256, at *1 (citing *Campbell v. State*, 189

---

[20] Prior to the 1997 changes to the Texas Rules of Appellate Procedure, in determining whether a defendant was harmed by a failure to sequester the jury, courts applied Rule 81(b)(2), which contained only one harm standard for both constitutional and statutory errors. *See Delgado v. State*, No. 08-05-00391-CR, 2008 WL 2402256, at *1 (Tex. App.—El Paso June 12, 2008, no pet.) (not designated for publication). Under this standard, it was the State's burden to establish that the sequestration did not harm the defendant's case. *See McIlveen v. State*, 559 S.W.2d 815, 818 (Tex. Crim. App. 1977) (where Appellant did not consent to the juror's separation for meals, the burden "shifted

S.W.3d 822, 826 (Tex. App.—Houston [1st Dist.] 2006, no pet.)); *see also Polk*, 367 S.W.3d at 454 (recognizing same); *Rojas v. State*, 986 S.W.2d 241, 252 (Tex. Crim. App. 1998) (Keller, J. concurring) (recognizing that Rule 44.2 is the "proper test" for determining harm arising from a violation of the sequestration statute). As set forth above, Rule 44.2(b) provides that, other than constitutional error, any "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." *See* Tex. R. App. P. 44.2(b).

### C. Analysis

Appellant points out that his attorney expressly made a request that the jurors be kept together during their deliberations and contends the trial court therefore violated the statute in refusing his request. The State counters that the trial did not err in denying Appellant's request, contending it was "impossible" for the trial court to sequester the jury under these circumstances. Whether the trial court could have or should have engaged in additional efforts to accommodate Appellant's request for sequestration is an open question. Regardless, the record does not reflect that Appellant's substantial rights were affected by the jury's separation.

As required by the Code, before allowing the jury to separate, the trial court provided the jury extensive instructions regarding their conduct as jurors once separated. *See* Tex. Code Crim. Pro. Ann. art. 35.23 ("In any case in which the jury is permitted to separate, the court shall first

---

to the State to 'rebut the presumption of harm.'"); *Taylor v. State*, 636 S.W.2d 600, 602 (Tex. App.—El Paso 1982, pet. ref'd) (recognizing same). To meet this burden, the State would typically question the jurors to determine if they had followed the trial court's instruction to not discuss the case during any period of separation. *See*, *e.g., McIlveen*, 559 S.W. 2d at 818 (trial court properly found that defendant was not harmed by jurors' separation where State elicited testimony from jurors that they did not violate the court's instructions to not discuss the case during separations); *McDonald v. State*, 597 S.W.2d 365, 367–68 (Tex. Crim. App. [Panel Op.] 1980) (holding that testimony of jurors at a subsequent hearing averring that they followed the trial court's instructions not to discuss case demonstrate that appellant was not harmed by the trial court's failure to sequester the jury).

give the jurors proper instructions with regard to their conduct as jurors when so separated."). First, the judge explained to the jury that typically jurors must be sequestered during their deliberations, but due to difficulties in making the sequestration arrangements, she was going to excuse them for the day. The judge cautioned them as follows:

> I am going to remind you of all the instructions that I have previously given to you. I'm going to tell you that it is very critical that you abide by all those instructions. You may want to ruminate, I read your note and it has been read into the record, on your own. But it would be improper for you to discuss this case in any way with anyone else, including your dog or your cat because someone might overhear that conversation. The only thing is individually you might be thinking about what you want to think about, but it would be a violation of the court's instructions if you said anything about anything in this case to anyone else in any way, shape or form. I would ask that you just do what you told me you were going to do in this note and that is just to sleep on it and come back in the morning and restart deliberations with your [fellow] jurors, and we would stand in recess until you advise if you had a question or reached a verdict. But I could not be more serious in my admonishment to you today and how serious it is--and really that it would be my preference that we sequestered you, but practically I have not been successful in making those arrangements. So in the interest of not continuing to keep you waiting, it's not going to happen, I'm going to recess for the night.

A jury is presumed to have understood and followed a trial court's instructions unless the record reflects otherwise. *See Taylor v. State*, 332 S.W.3d 483, 492–93 (Tex. Crim. App. 2011) ("we presume that the jury understood and followed the court's charges absent evidence to the contrary"). But an appellant may rebut that presumption by pointing to evidence in the record to establish that the jury failed to follow the instructions. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) (recognizing that a reviewing court "generally presumes that the jury follows the trial court's instructions in the manner presented," but appellant may "rebut the presumption by pointing to evidence that the jury failed to follow the trial court's instructions").

Here, Appellant has pointed to nothing in the record to suggest the jurors did not understand or follow the trial court's extensive instructions regarding their duty to refrain from discussing the

case with others while separated overnight. Appellant did not poll the jurors on this issue, nor did he file a motion for new trial or request a post-judgment hearing where the jurors could have provided testimony on the issue, which could have provided a factual basis for his argument. *Compare Delgado v. State*, 2008 WL 2402256, at \*2 (finding no harm from trial court's failure to sequester the jury where there was "nothing in the record showing the jury did not follow the instructions or of any other harm occurring from allowing the jurors to separate") *and Polk*, 367 S.W.3d 449, 454 (concluding same) *with Green v. State*, 754 S.W.2d 687, 688 (Tex. Crim. App. 1988) (en banc), *overruled on other grounds* by *Carranza v. State*, 960 S.W.2d 76 (Tex. Crim. App. 1998) (en banc) (holding that defendant was entitled to a hearing on his motion for new trial where he submitted an affidavit from a juror attesting that the jurors had "conversed with an unauthorized person regarding the case").

In terms of harm, Appellant argues his case poses a "far greater likelihood than in a run-of-the-mill case" as "the jurors had already begun to speak to non-jurors and receive other outside information about the case by the time they were allowed to separate during deliberations" given the earlier two-week continuance. But this argument, too, is speculative, as there is nothing in the record to suggest that the jurors engaged in any improper activity during either during the two-week separation or during the overnight separation while in deliberations.

As explained above, we will not indulge in speculation in determining whether an error—including errors in failing to sequester the jury—caused a defendant harm. *See Casias v. State*, 36 S.W.3d 897, 900 (Tex. App.—Austin 2001, no pet.) (appellate court will not indulge in "speculation" in determining whether a jury separation affected an appellant's substantial rights); *see also Byrd v. State*, 192 S.W.3d 69, 72 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd)

(where there was no evidence that the jury misapplied the law, appellate court "will not engage in raw speculation regarding the conduct of the jurors"); *Balderas v. State*, 517 S.W.3d 756, 791 (Tex. Crim. App. 2016) (record did not support appellant's "speculation that, as the result of fears generated by an outside influence, jurors abandoned their views in order to reach a verdict quickly").

Accordingly, we cannot conclude on this record that Appellant's substantial rights were violated by the trial court's failure to sequester the jury.

Appellant's third issue is overruled.

## CONCLUSION

The trial court's judgment is affirmed.

LISA J. SOTO, Justice

May 29, 2024

Before Alley, C.J., Palafox and Soto, JJ.

(Do Not Publish)

31